[No. C046813. Third Dist. Feb. 15, 2006.]

CALIFORNIANS FOR ALTERNATIVES TO TOXICS, Plaintiff and Appellant, v.
CALIFORNIA DEPARTMENT OF PESTICIDE REGULATION et al., Defendants and Respondents;
DOW AGROSCIENCES et al., Real Parties in Interest and Respondents.

1050

1054

COUNSEL

Law Offices of Thomas N. Lippe, Thomas N. Lippe; and Michael W. Graf for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Mary E. Hackenbracht, Assistant Attorney General, and Matthew J. Goldman, Deputy Attorney General, for Defendants and Respondents.

McKenna Long & Aldridge, Stanley W. Landfair, Ann G. Grimaldi and Eric S. C. Lindstrom for Real Parties in Interest and Respondents Dow AgroSciences, Gowan Company, Platte Chemical Company, and Syngenta Crop Protection, Inc.

Howrey Simon Arnold & White, Buckmaster de Wolf, Lisa S. Buccino and David B. Weinberg for Real Parties in Interest and Respondents FMC Corporation and Makhteshim Agan of North America, Inc.

OPINION

**RAYE, J.**—Defendant California Department of Pesticide Regulation (Department) regulates the manufacture, distribution, sale, and use of pesticides in California. The Department issues pesticide registration for eligible products, renews registrations annually, and reevaluates registrations. Plaintiff Californians for Alternatives to Toxics (Alternatives), a nonprofit corporation, challenged the Department's decision to renew a number of pesticide registrations for the 2002 calendar year. Alternatives filed a petition for writ of mandate and complaint for declaratory relief.

In its mandamus claims, Alternatives argued the Department abused its discretion and violated the California Environmental Quality Act (CEQA)[1] in renewing without reevaluating pesticide registrations in 2002. Alternatives's declaratory relief claims challenged the Department's procedure of renewing pesticide registrations prior to completing the process of inviting, considering, and responding to public comments regarding the impact of continued registration.

[1] Public Resources Code section 21000 et seq.

The trial court sustained the Department's demurrers to the mandamus claims challenging the 2002 renewals, finding the claims moot and untimely. As to the declaratory relief claims, the trial court held the Department complied with its regulations in renewing and refusing to reevaluate the pesticide registrations. The trial court further found the Department met the requirements for a CEQA-certified program. The court denied Alternatives's petition for writ of mandate and claim for declaratory relief.

Alternatives appeals, arguing: (1) the Department abused its discretion in renewing without reevaluation pesticides contaminating amphibians and their habitat in the Sierra Nevada, (2) the Department's procedure violates CEQA and the Department's regulations, (3) the court erred in finding the Department's procedure lawful, (4) the court erred in finding its mandamus claims moot, and (5) this court should reach the merits of the mandamus claims. Real parties in interest Dow AgroSciences, Gowan Company, Platte Chemical Company, and Syngenta Crop Protection, Inc. (Dow), and FMC Corporation and intervenor Makhteshim Agan of North America, Inc. (FMC) also filed briefs on appeal. We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Alternatives challenges the Department's procedure for the annual registration of pesticides. Alternatives argues the Department violates both CEQA and its own regulations in failing to reevaluate pesticides prior to their annual renewal. To properly consider this claim, we provide an outline of the pesticide regulatory program.

*Regulation of Pesticides*

The California Food and Agriculture Code, division 7, chapter 2 and implementing regulations promulgated at title 3 of the California Code of Regulations, division 6 establish a comprehensive program under which the Department regulates the manufacture, distribution, sale, and use of pesticides. The program seeks to provide for the proper, safe, and efficient use of pesticides essential for production of food and fiber, and to protect the public health and safety, as well as the environment, from harmful pesticides by ensuring proper stewardship of those pesticides. (Food & Agr. Code, § 11501.)

*Registration*

Pesticides sold in California must possess a "certificate of registration." (Food & Agr. Code, § 12811.) As a prerequisite to California registration, a pesticide must be registered by the United States Environmental Protection Agency (EPA). (2 U.S.C. § 136a.) A federally registered pesticide is

eligible for California registration if it meets any additional requirements imposed by the Department. The Department must register pesticides that comply with requirements set forth in the Food and Agriculture Code and implementing regulations. (Food & Agr. Code, § 12815.)

Before a substance is initially registered as a pesticide, "there shall be a thorough and timely evaluation in accordance with" the Food and Agriculture Code. (Food & Agr. Code, § 12824.) The code requires the Department to examine whether a pesticide demonstrates "serious uncontrollable adverse effects either within or outside the agricultural environment." (Food & Agr. Code, § 12825, subd. (a).)

The Department has identified eight specific criteria to which the Department is required to give "special attention." These criteria include the potential for environmental damage, including acute and chronic toxicity, interference with the attainment of applicable environmental standards, and "[t]oxicity to aquatic biota or wildlife." (Cal. Code Regs., tit. 3, § 6158(a)–(d).)[2]

Applicants for registration must submit scientific testing information demonstrating they meet these criteria. (§ 6170.) This information includes all data submitted to the EPA as well as any additional data required by the Department. (§ 6159.)

*Renewal of Registration*

Registrations expire on December 31 of the year in which they are issued. (Food & Agr. Code, § 12817.) A registrant must renew each registration annually. (*Ibid.*) Food and Agriculture Code section 12824, which sets the standard for registration, imposes the same standard for renewals.

Once a pesticide has been determined to meet the criteria for registration, the Department generally is required to renew each registration for which an application is timely submitted. (Food & Agr. Code, § 12817.) Applicants for renewal must certify compliance with statutory and regulatory requirements to report to the Department any "factual or scientific evidence of any adverse effect . . . ." (Cal. Code Regs., tit. 3, § 6210, subd. (a).)

Upon receipt of a completed renewal application, the Department must renew the registration within 60 days unless the Department takes action pursuant to Food and Agriculture Code section 12816, 12825, or 12827. (Cal.

[2] All further unspecified section references are to title 3 of the California Code of Regulations.

Code Regs., tit. 3, § 6215, subd. (b).) These sections provide for cancellation of a registration for failure to satisfy the criteria for registration or for failure of the registrant to comply with the Food and Agriculture Code.

*Reevaluation of Registration*

At any time, the Department may conduct a reevaluation to investigate reports of potentially significant adverse effects to health or the environment resulting from the use of pesticides. (§ 6220.) Under section 6220, the Department must investigate "all reported episodes and information received by the [Department] that indicate a pesticide may have caused, or is likely to cause, a significant adverse impact, or that indicate there is an alternative that may significantly reduce an adverse environmental impact." If the Department finds a significant adverse impact has occurred or is likely to occur, or that such an alternative is available, the pesticide must be reevaluated. (§ 6220.)

Food and Agriculture Code section 12824 requires that the Department, as part of the registration process, eliminate pesticides that endanger the environment and develop a program that calls for informal, continuous evaluation of all registered pesticides.

The Department shall also reevaluate a pesticide when certain factors have been found. (§ 6221.) These factors include environmental contamination, fish or wildlife hazard, or other information suggesting a significant adverse risk. (§ 6221, subds. (b), (d), (j).)

Section 6222, subdivision (b) provides that if the Department obtains information from an individual or organization indicating possible adverse effects from the use of a pesticide, the Department shall respond in writing. The Department will inform the individual or organization of the reasons for its decision to either reevaluate or not reevaluate the pesticide registration based on the information submitted.

As noted earlier, the Department generally is required to renew a registration upon timely application. However, section 6215, subdivision (c) requires the Department "when renewing a pesticide registration without a reevaluation" to "make a written finding that [the Department] has not received sufficient information necessitating reevaluation pursuant to Sections 6220 and 6221." (§ 6215, subd. (c).)

*Requirements for Public Review*

The Department must post on its official bulletin boards for 30 days for public review and comment each proposed decision relating to registration

or renewal. (§ 6253, subd. (a).) The Department must also post notice of each decision to begin reevaluation. (*Ibid.*)

In addition, the Department must prepare a public report on a proposed action that includes: (1) a statement of any significant adverse environmental effect that can reasonably be expected to occur, directly or indirectly; (2) a statement of any reasonable mitigation measures available to minimize any significant adverse environmental impact; and (3) a statement of reasonable alternatives that would reduce any significant environmental impact. (§ 6254.)

*Pesticide Regulation and CEQA*

CEQA authorizes certain state regulatory programs that meet specific environmental standards to comply with abbreviated CEQA requirements. (Pub. Resources Code, § 21080.5; Cal. Code Regs., tit. 14, §§ 15250–15253.) In 1979 the Secretary of the Public Resources Agency certified the Department's pesticide program, including the "registration, evaluation, and classification of pesticides," as functionally equivalent to CEQA. (Cal. Code Regs., tit. 14, § 15251, subd. (i).)

Such certification formally recognizes that an environmental analysis undertaken in compliance with the certified program is the functional equivalent of a CEQA analysis. (Cal. Code Regs., tit. 14, § 15251.) The Legislature found certification warranted, in part, because the "[p]reparation of environmental impact reports and negative declarations for pesticide permits would be an unreasonable and expensive burden on California agriculture and health protection agencies." (Cal. Code Regs., tit. 3, § 6100, subd. (a)(6).)

In implementing its pesticide regulatory program, the Department is exempt from the requirements otherwise imposed under CEQA to prepare environmental impact reports and negative declarations. (Pub. Resources Code, § 21080.5, subd. (c).) Instead of preparing such documents to support its decisions concerning registration, renewal, and reevaluation, the Department is required to prepare only the documents specified under its own regulations. (*Ibid.*; Cal. Code Regs., tit. 14, § 15252.)

*Pesticide Renewals for 2002*

On October 19, 2001, the Department sent its annual renewal memorandum to California pesticide registrants, including real parties in interest, announcing the expiration of their pesticide registrations on December 31, 2001, unless a timely application for renewal was filed.

The Department subsequently received applications for renewal from pesticide product registrants. An authorized representative signed each renewal application under penalty of perjury. The applications stated the

registrant had complied with section 6210, requiring registrants to disclose any evidence of adverse effect or risk posed by the pesticide.

On December 20, 2001, the Department posted findings of the director regarding the renewal of the registrations of pesticide products. The findings set forth the Department's identification of pesticides under reevaluation and for which factual information had been received, recounted the Department's consultation with state agencies on registration and reevaluation, stated the adverse effects disclosures had been satisfied, and documented the Department's determination that it had not received information sufficient to require reevaluation of pesticides.

The following day, the Department posted a proposed decision to renew registration of pesticides. The proposed decision announced the Department's decision to renew pesticides registered in 2001 for the 2002 calendar year. The decision also reiterated the Department's mandatory duty to renew pesticides for which it receives complete renewal applications unless it has canceled the product or taken action to refuse to register the product. The decision informed members of the public that they could submit information indicating possible adverse effects from use of a pesticide at any time. In addition, the decision noted the Department had not received information sufficient to necessitate reevaluation of pesticides that were under neither evaluation nor consideration for reevaluation in 2001. The 2001 proposed decision triggered a 30-day notice and public comment period. (§ 6253.)

That same day, December 21, 2001, the Department posted its "Public Report Relating to the Renewal of Pesticide Product Registrations for 2002" (Public Report). The Public Report reiterates the Department's authority to eliminate any pesticide that endangers the environment and its responsibility to continuously evaluate registered pesticides.

*Alternatives's Evidence in Response to the Renewals*

On February 8, 2002, Alternatives submitted extensive comments, accompanied by exhibits, regarding eight groups of pesticide products.[3] Alternatives argued the continued use and registration of these pesticides was "likely to have a significant impact on the viability of amphibian species located in the Sierra Nevada." Alternatives also claimed the Department was required to begin a formal reevaluation of products containing pesticides pursuant to section 6220.

The exhibits submitted by Alternatives revealed an increase in pesticide use since 1975 in the Central Valley. In 2000 over 94 million pounds of pesticides

[3] Alternatives requested that the Department reevaluate eight pesticides: malathion, chlorpyrifos, diazinon, methidathion, parathion, endosulfan, cholorothalonil, and trifluralin.

were applied in Central Valley counties. During this time, populations of several frog and toad species have declined in the Sierra Nevada.

Aerial drift of pesticides is common in the Central Valley; it is monitored by detection systems at various locations. Prevailing westerly winds carry pesticides from the valley into the Sierra Nevada foothills and mountains in the form of volatilized chemicals and particulates.

Studies have detected pesticides in winter rain, in air samples, and in pine needles along an elevation from the Central Valley to above 6,000 feet in the Sierra Nevada. A study in 1998 detected pesticide residue in snow, rain, and water samples taken from Sequoia National Park and Lake Tahoe. A 1999 study found pesticides in air and water samples from five different elevations ranging from 200 to 3,000 meters on a gradient running from the Central Valley to the Sierra Nevada.

Alternatives referenced several studies that found amphibians in the Sierra Nevada are exposed to and contaminated by pesticides. A 1998 study found traces of pesticide in tree frog eggs and tadpoles in Sequoia National Park at levels two-to-four times higher than those recorded in the Central Valley. A United States Geological Survey study found pesticide residues in Pacific tree frogs or tadpoles at Lake Tahoe, Yosemite National Park, and Sequoia National Park. The study also found pesticide exposures had reduced amounts of a key enzyme in tree frogs that regulates hormones and nerve functions.

Studies presented by Alternatives suggested pesticide exposure renders amphibians more susceptible to the diseases causing declines in amphibian populations in the Sierra Nevada, as well as worldwide. Recent studies found a certain pesticide increases the likelihood of fatal infection in toads from a common bacterium. Another study found reductions in immune system function of amphibians following pesticide exposure.

Alternatives also provided studies that demonstrated disease epidemics have decimated amphibian populations in Kings Canyon National Park and Sequoia National Park. Another study revealed massive toad deaths in Yosemite National Park. Researchers theorized the diseased toads died after their immune systems were suppressed by environmental factors, such as chemical pollution.

Attempts to reintroduce decimated species to their native habitats proved futile. Such attempts led Alternatives to conclude: "The observation that disease epidemics are playing a significant and unprecedented role in the decline of Sierra amphibian populations in pristine, otherwise unaltered habitats raises a strong concern that traditional habitat protection measures will be insufficient to protect Sierra amphibian populations." (Fn. omitted.)

Alternatives also claimed amphibian populations in downwind proximity to pesticide use have suffered far greater declines than populations in other areas. In support, Alternatives cited studies in which frogs have suffered substantially greater declines in population downwind of the Central Valley than in the coastal ranges to the west of the valley.

Finally, Alternatives argued the impacts of pesticides may be particularly significant because of other negative impacts on Sierra Nevada amphibians. Alternatives cited studies that reveal the introduction of nonnative predators has isolated amphibian populations. For example, the introduction of nonnative trout into lakes and streams has isolated mountain frog populations from one another. This isolation renders the frogs more sensitive to pesticide impacts, which may reduce the ability of isolated populations to survive winter or render populations more susceptible to disease.

*The Department's Response*

On February 28, 2002, the Department acknowledged receipt of Alternatives's comments and indicated it would "take several months to complete a review and evaluation to determine if a causal link exists that is adequate for us to take action."

In September 2002 the Department formally responded to Alternatives's comments and explained its decision not to reevaluate the eight pesticides. The Department summarized its findings, which were based on the documents submitted by Alternatives and additional studies. In addition, the Department enclosed copies of its own scientists' separately written reviews of each of the studies submitted by Alternatives.

The Department explained that upon receipt of an application to renew the registration for a pesticide not already under reevaluation, section 6215, subdivision (c) requires a finding that insufficient information has been received to necessitate a reevaluation. The Department recognized that the worldwide decline in amphibian populations deserved ongoing monitoring, but also stated that reevaluation of the eight pesticides was premature because of the lack of scientific studies linking pesticide use with the decline of certain frog populations in the Sierra Nevada.[4]

On October 4, 2002, the Department issued its notice of final decision to renew registration of pesticides. The Department stated its scientists "reviewed all of the submitted data and information. The authors of many of the

[4] A few days later, Department staff scientists participated in a bimonthly meeting of the Pesticide Registration and Evaluation Committee (PREC). The PREC is an interagency advisory committee that consults on proposed registration and renewal decisions. (§ 6252.) The Department of Fish and Game, a PREC member, concluded insufficient evidence supported Alternatives's request for reevaluation.

submitted articles agree that some amphibian populations in the Sierra Nevada are in decline and that the decline is the result of a multitude of factors. Declines and extinctions of certain amphibian populations have been reported worldwide, not just in California. Not all amphibian populations in the Sierra Nevada are in decline. Populations of the tree frog . . . do not appear to be in decline. While the submitted studies indicate that pesticide residues may be one of many factors contributing to amphibian decline, there is no direct confirmed evidence that pesticide residues are a major factor in amphibian deaths, or that a reduction or elimination of pesticide residues would reverse amphibian declines. After evaluating the submitted data, other data on file with DPR, and speaking with researchers studying amphibian populations, DPR determined that current data do not indicate a definitive link between the use of the above eight pesticides in the Central Valley and amphibian declines in the Sierra Nevada."

*Pesticide Renewals for 2003*

The Department's renewals of pesticides for 2003 followed substantially the same procedure as in 2002.

On October 17, 2002, the Department issued findings of the director regarding the renewal of pesticide products registrations. On October 22, 2002, the Department posted for public review and comment its notice of proposed decision to renew registration of pesticides for 2003.

On December 1, 2002, Alternatives requested that the Department reevaluate the pesticides diazinon and chlorpyrifos because of their possible impact on aquatic life in the Central Valley and Delta. Alternatives attached documents in support of its request. The Department notified Alternatives that its comments and supporting materials had been assigned to the Department's scientists.

On February 19, 2003, the Department issued a notice of decision to begin reevaluation of pesticide products containing diazinon. The notice initiated a 30-day comment period. The registrations of all pesticide products containing diazinon were renewed, subject to the outcome of the reevaluation process.

On October 21, 2003, the Department informed Alternatives that the available scientific data did not warrant the reevaluation of chlorpyrifos at that time. The Department stated it was familiar with concerns raised by Alternatives and that its "scientists have been actively working with the State Water Resource Control Boards to monitor California's streams and rivers for pesticide residues for many years." In addition, the Department noted it was familiar with most of the documentation submitted by Alternatives.

On October 23, 2003, the Department issued its notice of final decision to renew pesticide products registrations for 2003. This notice renewed the registrations of all pesticides that were not in reevaluation or under consideration for reevaluation, including chlorpyrifos.[5]

*Commencement of Litigation*

Alternatives filed a petition for writ of mandate challenging the Department's renewal of the pesticides in question without reevaluation. Subsequently, Alternatives filed a third amended verified petition for writ of mandate and complaint for declaratory relief. In its petition, Alternatives sought: (1) declaratory relief regarding the Department's failure to comply with the law in renewing the pesticide registrations, (2) mandamus relief regarding the Department's abuse of discretion in renewing pesticide registrations, and (3) mandamus relief regarding the Department's abuse of discretion in refusing to reevaluate the pesticides.

The Department, Dow, and FMC all filed demurrers to the complaint. The trial court sustained the demurrers as to the second and third causes of action for mandamus relief, finding them moot, but overruled the demurrer as to the first cause of action for declaratory relief.

The parties submitted briefs on the first cause of action and the trial court heard oral argument. The trial court denied Alternatives's claim for declaratory relief.

In its order, the court concluded: "CEQA requires a public agency to consider the environmental effects of its actions, and, as part of that process, to solicit, review and respond to public comments. The statutory and regulatory framework governing pesticide registration and renewal requires respondent to engage in a continuous process of environmental review. As part of that process, the public may submit relevant new information at any time, and a re-evaluation may be triggered at any time if that new information justifies it. The pesticide regulatory program has been certified as the functional equivalent of CEQA. Respondent complied with the requirements of its regulatory program by inviting, reviewing and responding to public comments regarding possible adverse environmental effects of renewing the

[5] We grant the Department's request for judicial notice of "Endangered and Threatened Wildlife and Plants; 12-Month Finding for a Petition To List the Sierra Nevada Distinct Population Segment of the Mountain Yellow-legged Frog (*Rana muscosa*)," published in the Federal Register, volume 68, No. 11 (Jan. 16, 2003). We also grant the Department's request for judicial notice of the trial court's order denying Alternatives's motion for attorney fees in *Deltakeeper v. California Department of Pesticide Regulation* (Super. Ct. S.F. City and County, 2004, No. CPF 03-503801).

registrations of certain pesticides at issue here before making a final determination on the renewals. Respondent thus complied with CEQA as well. Petitioner has not alleged in this action that respondent erred in any way in determining, with one exception, that re-evaluation of the pesticides it commented on was not required. Petitioner therefore has not demonstrated a violation of law." Alternatives filed a timely notice of appeal.

## DISCUSSION

*Declaratory Relief Action*

Alternatives requested declaratory relief, arguing the Department's procedures regarding reevaluation and renewal conflict with both its own regulations and CEQA. Specifically, Alternatives challenges the Department's yearly renewal of pesticide registrations without reevaluation. According to Alternatives, the trial court erred in finding this procedure comported with both the Department's regulations and CEQA.

*Timing of Renewals*

Alternatives presents a triad of objections to the Department's processing of renewals: failure to invite public comment, failure to consider comments prior to renewal, and failure to respond to public comment prior to renewal. Alternatives argues the process is faulty because the Department renews pesticide registrations before receiving and considering all information. This strikes Alternatives as antithetical to the spirit of the Department's regulations requiring review of available information and consideration of public comment.

As discussed, the renewal process revolves around section 6215, which states, in part: "(a) Each registrant shall submit with each renewal application a statement, signed by an authorized official . . . under penalty of perjury, that, prior to filing the renewal application the registrant has, to the best of the applicant's knowledge based upon all information available to the applicant, complied with the provisions of Section 6210, (Adverse Effect Disclosure). [¶] (b) Each renewal shall be issued within 60 days after the [Department] receives an accurate and complete renewal application unless the [Department] takes action pursuant to Sections 12816, 12825, or 12827 of the Food and Agricultural Code [cancellation of registration]. [¶] (c) The [Department] shall, when renewing a pesticide registration without a reevaluation, make a written finding that he or she has not received sufficient information necessitating reevaluation pursuant to Sections 6220 and 6221."

Alternatives objects to the Department's renewing pesticide registrations within the 60-day period before formally responding to public comments.

However, section 6215, subdivision (b), which establishes the 60-day renewal period, does not mention public comment or the Department's receipt of information that might ultimately trigger an investigation and subsequent reevaluation. Subdivision (b) requires only that the Department be in receipt of an accurate and complete renewal application. A complete renewal application includes a statement that the applicant has complied with the provisions of section 6210 regarding adverse disclosure.

■ Section 6215, subdivision (c) only requires that the Department make a finding "that he or she has not received sufficient information necessitating reevaluation . . . ." It does not require the Department to make a hasty decision regarding possible reevaluation of a pesticide by tying reevaluation to the 60-day time frame of annual renewal. Reevaluation can take place at any time and is not linked in any way to annual renewal. The finding required under subdivision (c) informs the public that the Department has either not received negative information about a pesticide or has not yet completely reviewed the available information to reach an informed conclusion. Rather than requiring the Department's review of scientific evidence to be completed within 60 days, subdivision (c) allows the Department to initiate reevaluation once it has completed its review of all available evidence.

In effect, section 6215 allows for a timely annual renewal process while soliciting information that may lead to future reevaluation. The timing of the Department's determination of the need for reevaluation is not bound to the 60-day time limit in subdivision (b) of section 6215. Nor does the finding made pursuant to subdivision (c) of that section rule out a subsequent reevaluation.

■ The Department is charged with developing an orderly program for the continuous evaluation of all pesticides actually registered and with endeavoring "to eliminate from use in the state any pesticide that endangers the agricultural or nonagricultural environment." (Food & Agr. Code, § 12824.) Faced with complicated scientific data, the reevaluation process can be orderly only if the Department has the flexibility to evaluate the evidence without an arbitrary, abbreviated time limit.

The Department may initiate the reevaluation process at any time. The registration process elicits public comment that may lead to further investigation and ultimate reevaluation. We discern nothing in the legislative scheme that requires the Department to invite public comment, and to consider and respond to comments within the 60-day period allowed for consideration and renewal of applications.

*Compliance with CEQA*

Alternatives argues the Department's pesticide registration renewal procedure violates CEQA, and the trial court erred in finding CEQA did not apply to registration renewal.

In finding CEQA inapplicable, the trial court noted CEQA allows state regulatory programs to be certified by the California Public Resources Agency as the functional equivalent of CEQA environmental review. The trial court also observed such certification is a finding that the regulatory program "establishes a process of public comment and environmental review that satisfies the demands of CEQA."

The court found the Public Resources Agency certified the Department's pesticide regulatory program, including the registration and evaluation of pesticides, as functionally equivalent to CEQA. Alternatives does not challenge this certification. The court concluded: "Because certification is, in effect, a finding that respondent's regulatory program establishes a process of public comment and environmental review that satisfies the demands of CEQA, a finding here that respondent complied with the applicable statutes and regulations is equivalent to a finding that respondent complied with CEQA."

The trial court correctly concluded that the Department's compliance with applicable statutes and regulations constitutes CEQA compliance. Public Resources Code section 21080.5, subdivisions (a) through (c) authorizes the Public Resources Agency to certify a regulatory program involving the grant of a license or other entitlement as exempt from several CEQA procedural requirements, including the issuance of an environmental impact report.

In *City of Sacramento v. State Water Resources Control Bd.* (1992) 2 Cal.App.4th 960 [3 Cal.Rptr.2d 643] (*City of Sacramento*), we considered a similar challenge to the Department of Food and Agriculture's implementation of a certified pesticide registration program. The plaintiffs argued the department failed to demonstrate CEQA compliance. The Public Resources Agency had previously certified the pesticide program as exempt from CEQA. This certification included the "regulation of the use of pesticides in agricultural and urban areas of the State through the permit system administered by the county agricultural commissioners." (*Id.* at p. 975, italics omitted.)

We rejected the plaintiffs' claims, finding the department's annual preparation of a rice pesticide plan is the functional substitute for much of the analysis to be undertaken by county agricultural commissioners when awarding permits for pesticide use. We concluded: "The annual [pesticide] plan is

thus an integral part of DFA's pesticide regulation and permit system and must be considered as included within the Resource Secretary's certification. DFA is therefore exempt from CEQA compliance in the preparation of such plans." (*City of Sacramento, supra,* 2 Cal.App.4th at p. 976.)

Alternatives contends that to the extent *City of Sacramento* holds that compliance by the Department with its own regulations satisfies CEQA, it was overruled by the Supreme Court in *Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215 [32 Cal.Rptr.2d 19, 876 P.2d 505] (*Sierra Club*). We disagree.

In *Sierra Club,* the Supreme Court considered whether the Board of Forestry abused its discretion in approving timber harvesting plans (THP's). (*Sierra Club, supra,* 7 Cal.4th at p. 1220.) The court found the board abused its discretion in approving THP's based on a record that lacked information regarding the presence of old-growth-dependent species. Both the Department of Forestry and the Department of Fish and Game had determined such information was necessary prior to approval. By approving the THP's without this information, the board failed to comply with both CEQA and the Z'Berg-Nejedly Forest Practice Act of 1973 (Pub. Resources Code, § 4511 et seq.). (*Sierra Club,* at p. 1220.)

Alternatives contends "there is no difference between the CEQA obligations of the Department of Forestry in implementing the Forest Practices Act and Rules, and DPR's obligations in implementing the provisions of the Food and Agriculture Code and regulations." However, Alternatives overlooks one major difference between the pesticide regulations at issue here and the THP's in *Sierra Club.*

In *Sierra Club,* the court noted CEQA is a legislative act, and the Legislature retains the authority to limit the projects to which CEQA applies. (*Sierra Club, supra,* 7 Cal.4th at pp. 1230–1231.) The court specifically found: "The Legislature has not included timber harvesting operations within any of the classes of projects that are exempt from CEQA . . . ." (*Id.* at p. 1231.) The court therefore rejected the real party in interest's assertions that the timber harvesting was exempt from CEQA. (*Ibid.*)

Here, in contrast, the Public Resources Agency certified the Department's pesticide registration program as the functional equivalent of CEQA environmental review in accordance with Public Resources Code section 21080.5. Therefore, as the trial court found, the Department's compliance with the applicable statutes and regulations constitutes CEQA compliance.

*Mootness of Mandamus Claim*

Alternatives contends the trial court erred by dismissing its mandamus claims as moot. Only Dow responds to this argument, claiming the trial court could not fashion any order that would have a practical impact or provide effective relief, since the 2002 renewals had already been superseded by subsequent renewals.

Alternatives's second cause of action alleged the Department abused its discretion in renewing without reevaluation eight pesticides for 2002. In its third cause of action, Alternatives challenged the Department's decision not to reevaluate the pesticide registrations, separate from its decision to renew the registrations.

The trial court sustained without leave to amend the demurrers of real parties in interest as to the second and third causes of action. During oral argument, the court expanded upon its tentative ruling, finding the causes of action moot. The court noted the annual renewal of pesticides effectively replaces, and thus moots, any legal challenge to the previous year's renewal decision.

A case becomes moot when a court ruling can have no practical effect or cannot provide the parties with effective relief. (*Simi Corp. v. Garamendi* (2003) 109 Cal.App.4th 1496, 1503 [1 Cal.Rptr.3d 207].) However, if a matter is of general public interest and is likely to recur in the future, a resolution of the issue by the court is appropriate. (*Rawls v. Zamora* (2003) 107 Cal.App.4th 1110, 1113 [132 Cal.Rptr.2d 675].) In addition, cases are not moot when they present questions that are capable of repetition, yet evade review. (*Hammond v. Agran* (1999) 76 Cal.App.4th 1181, 1186 [90 Cal.Rptr.2d 876].)

If an action involves a matter of continuing public interest and the issue is likely to recur, a court may exercise its inherent discretion to resolve the issue. The court may exercise such discretion even though an event occurring during its pendency would normally render the matter moot. (*Simpson v. Superior Court* (2001) 92 Cal.App.4th Supp. 1, 4 [111 Cal.Rptr.2d 819].)

We agree with Alternatives that the timing of renewals creates an impossible burden for those seeking to challenge the Department's decisions. The annual nature of the pesticide renewal program virtually ensures that litigation seeking mandamus relief against a registration renewal will not be resolved before the next annual renewal occurs.

This case raises important issues of public policy that are likely to recur, yet will evade review because of the cyclical nature of the renewal process.

Courts have rejected mootness arguments based on public policy considerations. (*Davis v. Superior Court* (1985) 169 Cal.App.3d 1054, 1061 [215 Cal.Rptr. 721].) As one court has noted: "We have discretion to decide otherwise moot cases presenting important issues that are capable of repetition yet tend to evade review." (*Conservatorship of Wendland* (2001) 26 Cal.4th 519, 524, fn. 1 [110 Cal.Rptr.2d 412, 28 P.3d 151].)

The trial court never addressed the mandamus claims. However, the record before us contains all the information necessary to review these claims de novo, and the Department has briefed these issues. Therefore, we find the court erred in sustaining the demurrers to the second and third causes of action and shall consider Alternatives's mandamus claims on the merits.

*The Mandamus Claims*

*Renewal Standard*

Alternatives argues that in deciding to renew registrations without initiating reevaluations the Department abused its discretion by applying an incorrect evidentiary standard. According to Alternatives, the Department's interpretation of the relevant standards required "conclusive" proof a pesticide caused harm to amphibians before the reevaluation process would be initiated. Although the regulatory scheme is not a model of clarity, we are persuaded that the Department correctly applied the relevant standards.

Two regulatory provisions are relevant to an assessment of Alternatives's argument.

Section 6220 provides, in relevant part, as follows: "The [Department] may, at any time, evaluate a registered pesticide . . . . The [Department] shall investigate all reported episodes and information received by the [Department] that indicate a pesticide may have caused, or is likely to cause, a significant adverse impact, or that indicate there is an alternative that may significantly reduce an adverse environmental impact. If the [Department] finds from the investigation that a significant adverse impact has occurred or is likely to occur or that such an alternative is available, the pesticide involved shall be reevaluated."

Section 6221 reads as follows:

"The director shall also reevaluate a pesticide when certain factors have been found such as, but not limited to:

"(a) Public or worker health hazard.

"(b) Environmental contamination.

"(c) Pesticide residue overtolerance.

"(d) Fish or wildlife hazard.

"(e) Lack of efficacy.

"(f) Undesirable phytotoxicity.

"(g) Hazardous packaging.

"(h) Inadequate labeling.

"(i) Disruption of the implementation or conduct of pest management.

"(j) Other information suggesting a significant adverse risk.

"(k) Availability of an effective and feasible alternate material or procedure which is demonstrably less destructive to the environment.

"(*l*) Discovery that data upon which a registration was issued is false, misleading, or incomplete."

While disputing what it claims is the Department's insistence on "conclusive proof" of pesticide-caused harm, Alternatives asserts that under the above regulations, section 6220 in particular, it was only required to provide information suggesting that pesticide contamination poses a risk to wildlife or a likelihood of significant impacts to trigger a reevaluation. We disagree both with Alternatives's characterization of the Department's argument and its interpretation of the regulations.

We find no indication that the Department has ever required conclusive proof of harm to amphibians in order to initiate the reevaluation process. Rather, the Department's position is that section 6220 provides a portal through which all "reported episodes" must pass in order for the Department to consider reevaluation. Once a claim is made, the Department exercises its scientific judgment as to whether the information is sufficient for the Department to make a finding that a significant adverse impact has occurred or is likely to occur.

The Department's analysis is correct. Section 6220 merely begins the reevaluation process. Information showing a "pesticide may have caused, or is likely to cause, a significant adverse impact" triggers a departmental investigation. (§ 6220.) Such information does not automatically mandate a reevaluation; it simply puts in motion the process by which the Department considers the potential harm of the pesticide. After its investigation, the Department responds in writing as to the reasons for its decision to either reevaluate or not reevaluate the pesticide based on the information submitted. (§ 6222.) The Department acknowledges that if it finds from the investigation that a significant adverse impact has occurred or is likely to occur because of use of the pesticide, then it must reevaluate. The notion that there must be a causal link between the pesticide and the adverse impact cannot be disputed.

 While Alternatives attempts to cast the issue as one of law by asserting the Department misapprehended the applicable standard, in reality Alternatives poses an issue of fact, viz.: whether the information it presented to the Department established that a significant adverse impact has occurred or is likely to occur because of use of the pesticide. On that point, Alternatives claims the information it provided raised an inference that pesticide use contributes to the decline of frog populations in the Sierra Nevada. Regardless of any "inferences" raised by the evidence, the Department is charged with investigating the evidence, drawing a conclusion, and communicating its findings. The Department considered Alternatives's information in conjunction with other information and studies. The Department decided against reevaluation because the data was insufficient to establish any connection between pesticide use and declining frog populations. The Department considered whether there was evidence of a causal link between pesticide use and a significant adverse impact or a likelihood of a significant adverse impact. In addition, the Department stated it would continue to monitor the issue, noting further studies might supply evidence of a causal link. The Department of Fish and Game, the state agency entrusted with responsibility over wildlife resources, agreed with the Department's assessment. For reasons hereafter discussed, we will conclude that the Department's factual conclusions are supported by substantial evidence. The Department's conclusions are also premised on a correct interpretation of the relevant legal standard.

*Adequacy of the Department's Response and Findings*

Alternatives faults the adequacy of the Department's response to the threat to amphibians posed by pesticide drift, labeling it conclusory and unreasoned. In addition, Alternatives argues the Department's findings are both incomplete and unsupported by substantial evidence.

Alternatives spotlights information it provided on the diseases afflicting toads and frogs in Yosemite. Alternatives contends the Department failed to explain why these studies do not raise a red flag. In addition, Alternatives provides a list of required findings it argues the Department failed to make.

Finally, Alternatives asserts the Department's decision to renew pesticide registrations without reevaluation is not supported by substantial evidence.

In effect, Alternatives claims the Department failed to respond appropriately to its concerns about the decline of amphibians in Yosemite. Alternatives links this decline to the use of pesticides in the valley below.

Our review of the record reveals the Department responded specifically to Alternatives's concerns regarding the toad and frog decline. The Department provided an evaluation report of all the studies submitted by Alternatives, along with summaries of studies gathered by the Department. The evaluation report provides a summary of each study, including significant quotes from each study and a conclusion.

The senior environmental research scientist who authored the evaluation report concluded: "[T]here is increasing, but no conclusive, evidence of a link between the use of pesticides in the San Joaquin Valley and the decline of amphibians in the Sierra Nevada. I recommend that DPR continue to examine this issue, as we have in the past, and encourage the continuation of scientific investigation into the causes of amphibian declines and deformation as well as other environmental impacts that may be attributed to the use of pesticides. We do not have sufficient data at this time to deny the renewal of these pesticide products, initiate reevaluation, or utilize mitigation measures against the registration of the eight pesticide active ingredients identified in the letter."

In addition, in a letter the Department responded to many of Alternatives's concerns, specifically the impact of pesticide drift on Sierra frog and toad populations. The letter discusses in depth the studies submitted by Alternatives. The Department acknowledges that two studies concluded that declines in four or five amphibian species were strongly associated with the amount of downwind agricultural land use. However, these studies "also advised caution in interpreting these results and concluded that field and laboratory studies were needed."

The Department also noted that the data submitted by Alternatives raised a host of questions. Various other amphibian species showed no decline despite the presence of pesticide residue. The Department provided a chronological review of various studies that indicated amphibian declines have been

attributable to numerous factors, including climate changes, loss of habitat, fragmentation of habitat, introduced predators, contaminants, and diseases.

The Department also discussed the uncertainty over exactly how various pesticides contribute to amphibian declines in the Yosemite area. A 1996 study concluded numerous explanations for the declines were possible, but "the overall cause of these dramatic losses remains unknown." A 2001 study notes amphibian populations are declining on all continents where amphibians occur, and several causes of the decline are attributable to human activities, such has habitat destruction, introduction of predators, and *direct* application of xenobiotics.

The Department concluded: "Despite the findings of pesticide residues in the Sierra Nevada, the data that you submitted do not show a direct link between the pesticide residues and frog mortality." The Department also noted scientific journal articles often fail to be consistent in the conduct of their research. This lack of consistency makes it difficult to reach scientific conclusions based on studies conducted under different conditions by different researchers in different parts of the world on dissimilar species.

The Department expressed a belief that more conclusive data focused on amphibians in the Sierra Nevada will be available in the next two to four years. However, given the current dearth of direct evidence, the Department found the link between pesticide use and amphibian declines in the Sierra Nevada to be tenuous. Lacking data indicating a definitive link, the Department did not have the scientific documentation needed to deny renewal or initiate reevaluation of the pesticides at issue.

The Department ultimately concluded: "Based on a careful evaluation of all the data submitted, further review of data already on file with DPR, and personal communication with researchers studying amphibians in California, we feel that there is increasing, but not conclusive, evidence of a link between the use of pesticides in the San Joaquin Valley and the decline of amphibians in the Sierra Nevada." The Department stated its intent to continue investigating the causes of amphibian decline.

Alternatives argues these responses do not constitute substantial evidence supporting the Department's decision to renew pesticide registrations. Alternatives argues the Department's sole basis for finding pesticides pose no risk to amphibians is its finding that Pacific tree frogs are not declining, raising the possibility that pesticides are having no effect. Alternatives argues that tree frogs are land dwelling and therefore exposed less to pesticides in aquatic environments. This, Alternatives argues, explains why tree frogs are not declining as precipitously despite pesticide drift. Alternatives contends: "Thus, the Court

cannot simply accept DPR's idle and unsubstantiated speculation that pesticides are having no effect."

We do not "simply accept" the Department's "speculation" in determining whether substantial evidence supports the Department's actions. We review the record and consider the evidence relied upon by both the Department and Alternatives. Our review of the evidence reveals the Department is not claiming pesticides have "no effect" and is not relying solely on the lack of decline among Pacific tree frogs. Instead, the Department painstakingly considered the studies provided by Alternatives and found any link between pesticides and amphibian declines tenuous and unsupported by current scientific evidence.

Alternatives also contends the lack of evidence in support of the Department's determination is particularly glaring given the "overwhelming" amount of evidence showing that adverse impacts are indeed highly likely. According to Alternatives, "Plaintiff's evidence establishes, as a matter of undisputed fact, that pesticides have been detected in amphibian habitat in the Sierra Nevada, including in remote areas of Yosemite and Sequoia National Parks and Lake Tahoe." Alternatives also argues the evidence shows amphibians have experienced mysterious declines, often through disease epidemics.

While Alternatives provided evidence of both pesticide exposure and amphibian declines, it is the link between them that proves problematic. The Department reviewed the data and studies examining amphibian declines and found experts attributed the declines to a variety of factors. This lack of a clear link between pesticides and amphibian decline led the Department to renew the registrations. None of the data provided by Alternatives forges such a link. As the evaluation report noted: "The majority of the authors of the submitted papers agree that unknown combinations of factors are involved in the deformation and decline/extinction of amphibian species in California and the world."[6]

Finally, Alternatives argues the Department failed to obtain the information necessary to identify whether the pesticide contamination impact on amphibians was significant. Alternatives contends the Department's conclusion that it

---

[6] As the Department points out, the studies refer to a variety of causes for amphibian decline: habitat destruction (four studies), habitat alteration because of agriculture (one study), habitat alteration because of livestock grazing (two studies), habitat alteration because of water resource development (two studies), disease (12 studies), nonpesticide contaminants (five studies), nonpesticide industrial chemicals (one study), mining operations (two studies), acid rain (one study), smog (two studies), introduced nonnative predators (eight studies), birds as predators (four studies), fish as disease carriers (one study), biologists transmitting disease during testing (two studies), UV radiation (three studies), and adverse weather (seven studies).

currently lacks sufficient information to deny renewal reveals a failure to obtain information to identify impacts. According to Alternatives, this failure to seek out information runs afoul of the Supreme Court decision in *Sierra Club.*

In *Sierra Club,* a lumber company submitted to the Department of Forestry two THP's covering old-growth forest. In response to a request by the Department of Fish and Game, the Department of Forestry asked the lumber company to provide information on old-growth-dependent wildlife species within the plan areas. The lumber company refused to provide the requested information, arguing it was not specified in the rules promulgated by the Board of Forestry. The Board of Forestry ultimately approved the THP's, finding no significant adverse effect on old-growth-dependent species. (*Sierra Club, supra,* 7 Cal.4th at p. 1219.)

The Supreme Court found the Board of Forestry abused its discretion when it evaluated and approved the THP's on the basis of a record that lacked information regarding the presence of old-growth-dependent species, information both the Department of Forestry and the Department of Fish and Game had determined was necessary. (*Sierra Club, supra,* 7 Cal.4th at p. 1220.) The court found the board had an obligation, imposed by CEQA, to collect information regarding the presence of old-growth-dependent species. Without this information, the board could not identify the environmental impacts of the project or carry out its obligation to protect wildlife. (*Id.* at p. 1236.)

Alternatives argues the registration renewals before us present a similar situation. We disagree. In the present case, no agency has requested, or even suggested, the need for additional information. Instead, the Department had before it the numerous studies provided by Alternatives and unearthed by the Department itself.

Ultimately, Alternatives disagrees with the Department's interpretation of the data it submitted in opposition to the pesticide registration renewals. Alternatives believes the scientific studies it offers prove a direct, concrete link between pesticide use in the San Joaquin Valley and the decline of amphibian populations in the Sierra Nevada. The Department painstakingly reviewed, summarized, and evaluated the proffered studies, as well as other pertinent studies, and found the evidence revealed a multiplicity of factors contributing to amphibian mortality. The Department acknowledged the need for continuing, targeted studies to determine the impact of pesticide use on amphibians, but found current information insufficient to trigger reevaluation

of the pesticides targeted by Alternatives. Alternatives's objections amount to a disagreement over which scientific studies to follow. The scientific evidence is not as definitive as Alternatives suggests. The link between pesticide use and amphibian decline in the Sierra Nevada may become clearer in the future as more studies proceed. For the present, sufficient evidence supports the Department's determination.

## DISPOSITION

The judgment is affirmed. The Department shall recover costs on appeal.

Davis, Acting P. J., and Nicholson, J., concurred.

A petition for a rehearing was denied March 17, 2006, and on February 16, 2006, and March 17, 2006, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied May 24, 2006, S142167. Chin, J., did not participate therein.