Filed 9/8/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JUANA VASQUEZ ET AL., Plaintiffs and Respondents, v. DEPARTMENT OF PESTICIDE REGULATION, Defendant and Respondent; DOW AGROSCIENCES LLC, Intervener and Appellant. | A154922 (Alameda County Super. Ct. No. RG17847563) |

Defendant Department of Pesticide Regulation (Department) regulates the use of pesticides, including 1,3-Dichloropropene (1,3-D), which is used in agriculture. The only company that produces 1,3-D for use in California is intervener Dow AgroSciences LLC (Dow). As a condition of Dow's continued registration of 1,3-D products, the Department maintains a "township cap program," which sets limits on the amount of the pesticide that may be used each year to reduce cancer risks to bystanders living and working near areas where 1,3-D is applied.

Juana Vasquez, Californians for Pesticide Reform, and Pesticide Action Network North America (collectively, plaintiffs) filed a petition for a writ of mandate and complaint against the Department, claiming that the township cap program (1) is an underground regulation in violation of the Administrative Procedure Act (APA) (Gov. Code, § 11340 et seq.) and (2) fails

1

to incorporate recommendations from the California Office of Environmental Health Hazard Assessment (OEHHA) as required under Food and Agriculture Code[1] sections 12980 and 12981.  The trial court granted plaintiffs' motion for summary judgment and issued a judgment and writ of mandate declaring the township cap program void and directing the Department to engage in formal rulemaking to replace it.

On appeal, Dow contends that the trial court erred by granting summary judgment in favor of plaintiffs and instead should have granted the Department's cross-motion for summary judgment, which Dow joined.[2]  We agree with plaintiffs that the court correctly determined that the township cap program is an underground regulation.  We also agree with the parties that in light of this holding, we need not address whether sections 12980 and 12981 apply to the program in its current form.[3]  We therefore affirm.

## I.
### FACTUAL AND PROCEDURAL BACKGROUND

*A.    The Regulatory Scheme*

Division 7, chapter 2 of the Food and Agriculture Code and its implementing regulations in title 3, division 6 of the California Code of Regulations "establish a comprehensive program under which the

---

[1] All further undesignated statutory references are to the Food and Agriculture Code.

[2] Although the Department is technically a respondent because it did not appeal, it submitted briefing in which it also argues that the trial court erred by granting summary judgment to plaintiffs.

[3] The applicability of sections 12980 and 12981 will depend on the contours of any final adopted regulation.  We deny as unnecessary Dow's and the Department's requests for judicial notice of legislative history of sections 12980 and 12981 and various Department documents.  (See *Adams v. Bank of America, N.A.* (2020) 51 Cal.App.5th 666, 673, fn. 4.)

Department regulates the manufacture, distribution, sale, and use of pesticides."[4] (*Californians for Alternatives to Toxics v. Department of Pesticide Regulation* (2006) 136 Cal.App.4th 1049, 1056 (*Californians for Alternatives*).) A pesticide cannot be sold in California unless it is registered with the Department. (§ 12811.) The Department will register a pesticide only if it is federally registered as a pesticide and meets additional state requirements. (*Californians for Alternatives*, at pp. 1056–1057; 7 U.S.C. § 136a, subd. (a); § 12815.)

Upon registering a pesticide, the Department may place "[a]ppropriate restrictions . . . upon its use including, but not limited to, limitations on quantity, area, and manner of application." (§ 12824.) The Department must then engage in an informal "continuous evaluation" of all registered pesticides to ensure they are safe. (§ 12824; Regs., § 6220; *Californians for Alternatives*, *supra*, 136 Cal.App.4th at p. 1058.) As part of this evaluation, the Department assesses a pesticide's risk to human health and determines whether mitigation measures, which may include additional conditions of registration, can be adopted. If the risk cannot be mitigated sufficiently, the Department may cancel a registration. (See § 12825.)

The Department also has the option to designate a pesticide as a restricted material. (§ 14004.5.) This designation may be based on, among other criteria, "[d]anger of impairment of public health" and "[h]azards to applicators and farmworkers." (§ 14004.5, subds. (a) & (b).) To use a restricted material, an operator must first obtain a permit from the local county agricultural commissioner (commissioner). (§§ 26, 14006.5; Regs., § 6420.) Thus, "[r]egistration of a restricted material is not in itself a right to

_____

[4] All further references to regulations are to title 3 of the California Code of Regulations.

3

use the pesticide, but rather a [D]epartment determination that under appropriate local conditions the commissioner can grant a use permit for the material." (Regs., § 6442, subd. (a).)

When deciding whether to issue a restricted-material permit, a commissioner must "determine if a substantial adverse environmental impact may result from the use of such pesticide." (Regs., § 6432, subd. (a).) If such a risk exists, but there is a "feasible mitigation measure" that would "substantially reduce the adverse impact," the permit must be "conditioned on the utilization of the mitigation measure." (*Ibid.*) In making these determinations, a commissioner must rely on his or her knowledge of "local conditions." (*Ibid.*)

After an operator procures a restricted-material permit from a commissioner, the operator must obtain a written recommendation from a licensed pest control adviser "covering each agricultural use application of a pesticide that requires a permit." (Regs., § 6426; see *id.*, § 6556.) A commissioner may require the operator to submit a "notice of intent" providing information about the planned pesticide application at least 24 hours before it occurs. (*Id.*, § 6434, subd. (b).)

Each commissioner is "responsible for local administration" of efforts to enforce pest control requirements, but the Department is "responsible for overall statewide enforcement and shall issue instructions and make recommendations to the commissioner. Such instructions and recommendations shall govern the procedure to be followed by the commissioner in the discharge of his [or her] duties." (§ 2281.) Under this authority, the Department issues recommended permit conditions for various pesticides designated as restricted materials.

4

### B.     1,3-D's Use in California

1,3-D is the active ingredient in soil fumigant products that are generally injected into the soil before planting.  The pesticide is used to improve growing conditions for a variety of crops in California, including nuts, grapes, and strawberries.  It is designated as a restricted material. (Regs., § 6400, subd. (e).)  When it is applied, 1,3-D volatizes into the air, and people can be exposed to it through inhalation.

1,3-D has been used in California agriculture for several decades.  Dow is the only producer of 1,3-D for use in the state, although several soil-fumigation products containing the chemical are available.

The regulatory controls governing 1,3-D's use in California have arisen in the context of a technical bureaucratic environment, which we take some time to explain.  In 1990, after 1,3-D was detected in the air at "levels of concern," the Department prohibited its use.  Five years later, 1,3-D was reintroduced as another soil fumigant, methyl bromide, was phased out. Reintroducing 1,3-D was conditioned on "strict control measures, including amended pesticide labels, reduced application rates, buffer zones, lengthened reentry intervals, and Dow control of distribution and use, in close consultation with the . . . commissioners."

"Since 1999, the key mechanism that has been used to restrict use" of 1,3-D is the township cap program, which is a condition of registration of Dow's 1,3-D products.  As the registrant, Dow is "responsible for tracking, reporting, and ensuring township caps are observed."  The condition limits the amount of 1,3-D that can be applied each year in a given 36-square-mile region, or "township."  Originally, the township cap was 90,250 adjusted pounds of 1,3-D per year.  In 2002, the Department revised the condition so that townships could "bank" unused amounts under the cap for use in future

5

years, permitting increased applications of up to 180,500 adjusted pounds per year. The condition was based on a target air concentration of 1,3-D of no more than .14 parts per billion (ppb), a figure derived from a health risk assessment performed in the late 1990's.

The revisions to the township cap program that are at issue were developed over several months beginning in 2015. In August of that year, after performing an updated health risk assessment of 1,3-D, the Department submitted a draft "Risk Characterization Document" to OEHHA for review and comments. The two state entities disagreed on whether the risk assessment should be based on a "systemic" or "portal of entry" mode of action for cancer development. The former, which OEHHA advocated, assumes that a chemical will interact with the body systemically, and it results in a lower target air concentration of 1,3-D. The latter, which the Department used, assumes a chemical will interact with the body at the point of entry, and it results in a higher target air concentration of the chemical.

A few months later, in December, the Department issued its final risk characterization document, entitled "1,3-Dichloropropene Risk Characterization Document, Inhalation Exposure to Workers, Occupational and Residential Bystanders and the General Public" (final risk characterization document). The document, which is almost 300 pages long, addressed "risks arising from inhalation exposure" to both workers and occupational and residential bystanders, and it contained calculations for both systemic and portal of entry modes of action.

In August 2016, the Department provided OEHHA with a draft Risk Management Directive. The draft proposed to revise the target air concentration of 1,3-D to .56 ppb—a substantial increase from the previous figure of .14 ppb—and, based on the higher concentration, to increase the

6

annual township cap to 136,000 adjusted total pounds of 1,3-D. OEHHA responded that it did "not believe that the proposed cap can assure adequate health protection for all residents of a given township," reiterating its objection to the portal of entry mode of action.

In October 2016, the Department issued an internal memorandum entitled "Risk Management Directive and Mitigation Guidance for Cancer Risk from 1,3-Dichloropropene (1,3-D)" (final risk management directive). In it, the Department confirmed its determination "that it is appropriate to use a portal of entry mechanism as opposed to the [systemic] mechanism that was selected previously." The Department also confirmed its decision "to set the regulatory target concentration necessary to initiate and guide the development and adoption of mitigation measures to address cancer risk to bystanders (nearby workers and residential/public)" at .56 ppb. The document noted that "[r]isk management decisions to address cancer risk to handlers of 1,3-D (workers involved in the application), as well as acute, seasonal, and chronic (non-cancer) exposures identified in the [final risk characterization document] will be issued at a later date after further analysis and consideration."

The final risk management directive also addressed the measures the Department would take to "achiev[e] the . . . regulatory target concentration." The document stated that, "[e]ffective January 1, 2017, [Department] staff will make the following revisions to the township cap program": (1) changing the township cap to 136,000 adjusted total pounds per year; (2) eliminating banking of unused 1,3-D; and (3) prohibiting use of 1,3-D in the month of December due to seasonal conditions. In addition, the Department stated that if ongoing "air monitoring shows one-year average air concentrations

7

that are between 0.27 and 0.56 ppb," it would "consider more stringent mitigation measures."

Two months later, in December 2016, the Department entered a memorandum of understanding (MOU) with Dow that "establishe[d] a new Updated Management Program for the distribution and application of [1,3-D]." The MOU provided that, "effective in January 2017," the updated program would "be implemented through the permit system for restricted materials operated by the [commissioner] of each county where 1,3-D is used." Specifically, after "issuance of a restricted materials permit by the . . . [local commissioner]," 1,3-D products could be applied "only upon the recommendation of a licensed pest control advisor," which Dow had to approve. Dow agreed to take particular steps to ensure "the township caps are not exceeded," consisting primarily of following various directives on how to evaluate recommendations of pest control advisors that were submitted to it. For example, Dow agreed not to approve a recommendation unless the company first "ensure[d] . . . that the amount of 1,3-D to be applied pursuant to the recommendation will not cause the township limit of 136,000 adjusted pounds per year to be exceeded." In addition, the MOU provided that if another party were to "introduce[] a 1,3-D soil fumigant product in California that is produced from 1,3-D not manufactured by [Dow], . . . [the Department would] require that [third party] to discharge the same tasks and duties for its product that are to be discharged by [Dow] under [the MOU]."

The MOU also addressed "enforcement" of the revised township cap program. Dow and the Department "acknowledge[d] that provisions of the [MOU] may be construed as rules, regulations, limitations[,] or conditions for permitting within the meaning of . . . Section 14027, and that a violation of any requirement, limitation[,] or prohibition" could result in an action for

8

civil penalties.  The parties agreed that "[i]n this regard," if "an applicator, registrant[,] or other person other than [Dow] or its contractor" committed a violation, it would "not be construed as a violation by [Dow]."  In addition, the MOU provided that if it was "not carried out effectively," the Department could "exercise its authority to instruct [commissioners] to suspend the further issuance of restricted material permits for 1,3-D until another equally effective management plan [could] be implemented or, if the Department concludes that the continued use of 1,3-D results in serious uncontrollable adverse effects to the environment," the agency could "initiate a proceeding to cancel [1,3-D's] registration(s) pursuant to . . . Section 12824."

On January 10, 2017, the Department sent a letter to the commissioners enclosing revised "Recommended Permit Conditions" for 1,3-D.  The letter explained that, effective January 1, the Department had "updated" the township cap program based on the final risk management directive.  According to the letter, the "changes include[d]" (1) establishing a single cap of 136,000 adjusted pounds and eliminating banking; (2) prohibiting use of 1,3-D in December; and (3) requiring notices of intent submitted by operators to a commissioner to "document the amount of 1,3-D left available in a township."

The revised "Recommended Permit Conditions" were not set forth in a freestanding document.  Instead, they were in Appendix J to the third volume of the Department's "Pesticide Use Enforcement Program Standards Compendium," which addresses several other pesticides designated as restricted materials.  Revised Appendix J stated that the "recommended permit conditions . . . should be used in addition to" product labeling and the applicable statutory and regulatory provisions.  It also directed that "[w]hen requirements differ the most stringent requirements should be followed.

[Commissioners] can use more restrictive conditions based on the local use conditions." (Boldface omitted.)

The second section of revised Appendix J, entitled "Conditions for All Application Methods," identified particular conditions on the use of 1,3-D. Some of these conditions addressed the notice of intent an operator must submit to a commissioner before a particular application of 1,3-D. Specifically, a commissioner could not accept a notice of intent unless the operator provided a Dow-approved recommendation of a pest control advisor. The notice of intent itself had to contain information "[i]n addition to [that] required in [Regulations] section 6434," including the "[s]tarting [adjusted total pounds] balance available in the township prior to the proposed application." And the notice of intent had to "be denied if the proposed application [adjusted total pounds] exceeds the available use limit balance in a township." The conditions also included various "restrictions" on the use of 1,3-D, including no use in the month of December.

### C.     *Procedural History*

Shortly after the January 2017 letter was sent to the commissioners, plaintiffs initiated this action by filing a petition for a writ of mandate and complaint against the Department. The pleading alleged that plaintiff Vasquez, a strawberry harvester, worked and lived near fields treated with 1,3-D. The cause of action at issue alleged that the Department violated the APA "by adopting underground regulations regarding 1,3-D" without formal rulemaking. Plaintiffs sought a declaration that the existing regulations were invalid and a writ of mandate compelling the Department to promulgate lawful regulations in their stead. The Department answered the petition and complaint, and Dow was permitted to intervene as a defendant in the action.

10

Subsequently, the Department, joined by Dow, and plaintiffs filed cross-motions for summary judgment. The Department contended that plaintiffs' claim failed "because the challenged actions—the Department's internal guidance document dated October 6, 2016[,] and referred to as the 'Risk Management Directive,' and the Department's January 10, 2017 letter to County Agricultural Commissioners with attached revised recommended permit conditions—are not regulations subject to [APA] requirements . . . , as a matter of law." Plaintiffs, on the other hand, sought summary judgment on the basis there were no triable issues of material fact as to their claim that the Department "adopted its township cap program as an underground regulation without complying with the [APA]."

In February 2018, the trial court issued a "preliminary tentative decision" concluding that plaintiffs could not prove their claim. The preliminary decision was based on the court's conclusions that (1) "[t]he township cap program was adopted and modified as part of the registration and re-registration of 1,3-D," and "the issuance and renewal of certificates of registration is outside the scope of the APA"; and (2) "[t]he township cap program was implemented as a 'recommendation' to [the commissioners]" such that it was not a generally applicable rule requiring rulemaking under the APA. The court gave the parties an opportunity to submit supplemental briefs before it issued a final ruling, however, because it had considered aspects of the regulatory structure the parties had not addressed.

After the parties submitted supplemental briefing, the trial court reversed course and issued a final order granting plaintiffs' motion for summary judgment and denying that of the Department and Dow. In May 2018, the court entered a judgment declaring the township cap program void and issued a writ of mandate directing the Department to engage in

rulemaking to "address potential cancer risks to bystanders from the use of 1,3-D, consistent with the APA . . . , no later than one year following the date the writ is issued."[5]  Dow appealed.

## II.
### DISCUSSION

Dow, joined by the Department, claims that the township cap program is not a regulation subject to the APA's rulemaking requirements.  We conclude that the trial court correctly held that the program is an underground regulation.

### A.    *General Legal Standards*

"The APA subjects proposed agency regulations to certain procedural requirements as a condition to their becoming effective," including public notice and opportunity for comment.  (*Morning Star Co. v. State Bd. of Equalization* (2006) 38 Cal.4th 324, 332–333 (*Morning Star*); *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 568 (*Tidewater*).)  Thus, "any regulation not properly adopted under the APA is considered invalid." (*Reilly v. Superior Court* (2013) 57 Cal.4th 641, 649.)  It is undisputed that the Department must comply with the APA in adopting regulations.  (See § 14; *Californians for Pesticide Reform v. Department of Pesticide Regulation* (2010) 184 Cal.App.4th 887, 905.)  The issue here is whether the township cap program qualifies as a regulation.

Under the APA, "[n]o state agency shall issue, utilize, enforce, or attempt to enforce any guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule, which is a regulation as

---

[5] The writ provides that "until formal rulemaking is completed," the township cap of 136,000 adjusted total pounds and the prohibition on December applications remain in place "as interim measures to address potential cancer risks to bystanders from the use of 1,3-D."

defined in [Government Code s]ection 11342.600, unless [the same] has been adopted as a regulation and filed with the Secretary of State pursuant to this chapter." (Gov. Code, § 11340.5, subd. (a).) In turn, "regulation" is defined as "every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of any rule, regulation, order, or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure." (*Id.*, § 11342.600.)

"A regulation subject to the APA thus has two principal identifying characteristics. [Citation.] First, the agency must intend its rule to apply generally, rather than in a specific case. The rule need not, however, apply universally; a rule applies generally so long as it declares how a certain class of cases will be decided. [Citation.] Second, the rule must 'implement, interpret, or make specific the law enforced or administered by [the agency], or . . . govern [the agency's] procedure.' " (*Tidewater*, *supra*, 14 Cal.4th at p. 571.) Here, the trial court concluded that the township cap program is a regulation under *Tidewater* because it "is a rule that applies generally to all end users of 1,3-D products" and "implements the law enforced or administered by [the Department]."

A motion for summary judgment is properly granted if "there is no triable issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) Whether an agency action qualifies as a regulation under the APA is a question of law, and thus resolution of the issue through summary judgment is particularly appropriate. (*County of San Diego v. Bowen* (2008) 166 Cal.App.4th 501, 517; see *Archer v. Coinbase, Inc.* (2020) 53 Cal.App.5th 266, 278.) We review a grant of summary judgment de novo. (*Aguilar v. Atlantic Richfield Co.* (2001)

13

25 Cal.4th 826, 860.)  Although we independently consider whether summary judgment was properly granted, " 'it is the appellant's responsibility to affirmatively demonstrate error,' " and "review is limited to issues adequately raised and supported in the appellant's brief."  (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125–126.)

### B.    *The Agency Rule at Issue*

We begin by addressing the contours of the pertinent agency rule.  The trial court determined that the rule at issue was the revised township cap program, whose "two primary components" are "(1) the 'annual limit' and (2) the 'prohibition in December.' "  The court also concluded that the program, while set out in the October 2016 final risk management directive, the MOU, the January 2017 letter to the commissioners, and/or revised Appendix J, was "implemented . . . as a condition of the registration of 1,3-D."

Certain aspects of this ruling are not at issue.  First, it is undisputed that the township cap program amounts to a condition of 1,3-D's continued registration.  Second, plaintiffs do not challenge the trial court's determination that the December prohibition did not require rulemaking under the APA.[6]  Accordingly, we focus on whether the annual cap on 1,3-D's use in a particular township, as a condition of Dow's continued registration of the pesticide, qualifies as a regulation.

On appeal, Dow and the Department fail to grapple with this framing of the relevant rule.  Both parties claim that plaintiffs in fact "challenge[d] two discrete [Department] documents as supposed 'underground regulations,' " the final risk management directive and revised Appendix J.

_____

[6] Specifically, the trial court concluded that the December prohibition is "similar to a labeling issue" and therefore not a regulation under the APA. (See *Patterson Flying Service v. Department of Pesticide Regulation* (2008) 161 Cal.App.4th 411, 429 (*Patterson*).)

14

According to Dow and the Department, the revisions to the township cap program were implemented and are enforceable solely through the MOU, but since plaintiffs did not challenge that document in the petition it is "outside the scope of this litigation." In its final order, however, the trial court explicitly rejected these arguments, and neither Dow nor the Department attempts to explain why the court thereby erred.

In our view, the trial court correctly refused to take such a constrained view of plaintiffs' claims. A regulation subject to the APA may exist even if the agency never "promulgate[s] a *written* policy" setting forth the rule at all. (*Morning Star*, *supra*, 38 Cal.4th at p. 336.) In *Morning Star*, for example, although the agency's interpretation of a governing statute was never set forth in a particular document, "the record establishe[d] that [the agency's interpretation had] been as fixed and far reaching as would be the case if a written policy had been issued." (*Ibid.*) The Supreme Court rejected the notion that the lack of a written policy was significant, stating that it "decline[d] to endorse an approach that would allow an agency to avoid APA requirements simply by driving its regulations further underground." (*Ibid.*) In other words, the form of an agency rule is not necessarily determinative of whether it qualifies as a regulation. Rather, the focus is on whether, as actually applied, it meets the *Tidewater* requirements. Thus, even if we assumed that the MOU is the only document that "implemented" or made "enforceable" the township cap program, that does not mean the MOU itself is the rule at issue. Rather, it is merely one of the documents that memorializes the rule.

Consistent with this view, the petition challenged "revised permit conditions for 1,3-D effective January 1, 2017," that were "[publicly] released" on January 10 and "had been announced in" the final risk management

15

directive. Although the petition elsewhere characterized the risk management directive and revised Appendix J as "underground regulations" themselves, plaintiffs' motion for summary judgment made clear their position that "the actions of [the Department] to implement a township cap program" amounted to a regulation. Thus, we find it of little significance that the petition did not specifically refer to the MOU. This is particularly true since, as the trial court found, Dow and the Department had "a fair opportunity" in their briefing below to respond to the identification of the relevant agency rule. (Cf. *Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1258 & fn. 7 [where *defendant* moves for summary judgment, allowing plaintiff to expand claims in opposition without amending pleading "allows nothing more than a moving target"].)

In short, we agree with plaintiffs and the trial court that the agency rule at issue is the revised township cap program, and particularly the annual cap on the amount of 1,3-D that may be applied in a township. Therefore, we turn to address whether that program—*not* the final risk management directive, revised Appendix J, or the MOU individually— qualifies as a regulation under *Tidewater*.

C.     *The First* Tidewater *Requirement*

As we have said, the first characteristic of a regulation subject to the APA is that "the agency must intend its rule to apply generally, rather than in a specific case." (*Tidewater, supra,* 14 Cal.4th at p. 571.) The trial court concluded that the township cap program applies generally under *Tidewater* because it "limits whether any potential user of a 1,3-D product can use it in a township given the aggregate use of the product to date." The court also noted that "[t]he MOU states that if any other producer or registrant introduces a 1,3-D product then [the Department] must require that new

16

producer or registrant to discharge the same tasks and duties that [Dow] has under the MOU," and revised Appendix J "states that it applies generally to 'pesticide products containing the active ingredient . . . [1,3-D],' " not just Dow's products. In other words, the annual limit affects not just Dow but all California users of 1,3-D, as well as any future other registrants of a product containing the chemical.[7]

Initially, we consider and reject Dow's suggestion that conditions of registration categorically are not subject to rulemaking. Dow points to a provision that exempts from APA rulemaking procedures any "regulation that is directed to a specifically named person or to a group of persons and does not apply generally throughout the state" (Gov. Code, § 11340.9, subd. (i)), implying that any condition "to continued registration of a particular chemical . . . by a particular company" would meet the exemption. The Department, proceeding from its incorrect framing of the issue as "whether the MOU itself is a regulation under the APA," argues more directly that this exemption applies because "the MOU is 'directed to' a single entity—[Dow], the registrant." But the trial court determined the exemption did not apply, reasoning that the township cap program was "directed" not just to Dow but to users of 1,3-D products generally, and an interpretation otherwise "would be unreasonable and unworkable" because it would cause the exemption to "disappear[]" if another manufacturer of 1,3-D entered the California market. Neither Dow nor the Department attempts to explain

---

[7] In concluding that the township cap program is a regulation, the trial court gave "some weight" to the fact the Department previously promulgated through formal rulemaking similar regulations to address the use of methyl bromide. We need not address the parties' dispute about whether this analysis was proper, as we ultimately review the court's result, not its reasoning. (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694.)

17

why the court's reasoning was incorrect, and their arguments that this exemption applies are thus forfeited.

In suggesting that conditions of registration generally do not qualify as regulations, Dow also states that the fact "the relevant Food & Agricultural Code sections governing [the Department's] authority to place conditions on a pesticide regulation do not require APA rulemaking procedures" is " 'strong evidence that the Legislature did *not* intend to require' APA rulemaking for those discrete actions." This argument "lack[s] persuasive force," however, "because the APA does not have to be referenced in a statute . . . before it applies: It applies generally to any regulation meeting the APA definition, absent an exemption." (*Savient Pharmaceuticals, Inc. v. Department of Health Services* (2007) 146 Cal.App.4th 1457, 1469; *Morning Star*, *supra*, 38 Cal.4th at p. 335.) Moreover, Dow again fails to acknowledge that the trial court ruled against it on the issue, by specifically refusing to find "an implied exception" of "the pesticide registration process" from the APA's rulemaking requirements. Any claim the court thereby erred is thus forfeited as well.

Relying on *Patterson*, Dow and the Department also urge that a condition of a specific party's registration of a specific pesticide is not generally applicable under *Tidewater*. The *Patterson* appellants challenged a fine imposed on a company "for failing to follow the label directions when it made an aerial application of pesticides." (*Patterson*, *supra*, 161 Cal.App.4th at p. 417.) The fine was imposed under section 12973, "which provides: 'The use of any pesticide shall not conflict with labeling registered pursuant to this chapter which is delivered with the pesticide or with any additional limitations applicable to the conditions of any permit issued by the director or commissioner.' " (*Patterson*, at p. 417.) The Fifth District Court of Appeal

18

rejected the appellants' claim that the labeling "was an 'underground regulation' pursuant to which it was improper to impose a penalty." (*Id.* at p. 429.) The court reasoned that the fine was in fact imposed for violating section 12973, and the labeling itself "[was] not intended to apply generally rather than to a specific pesticide; it [was] not approved or registered to implement, interpret[,] or make specific the law enforced by the agency. Rather, the labeling [was] intended to accurately inform the user of the purposes for which the pesticide may be used, the manner in which it may be used, and the hazards involved in its use." (*Patterson*, at p. 429.)

We decline to read *Patterson*'s statement that pesticide labeling is "not intended to apply generally rather than to a specific pesticide" (*Patterson*, *supra*, 161 Cal.App.4th at p. 429) to mean that any agency rule addressing only a particular pesticide can *never* qualify as a regulation. The line between rules that "apply generally, rather than in a specific case" (*Tidewater*, *supra*, 14 Cal.4th at p. 571) reflects the distinction between the "adjudicatory determinations of an administrative agency [and the] . . . actions undertaken by such an agency in its legislative capacity." (*Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34, fn. 2; see *Tidewater*, at pp. 571, 573–575.)[8] "Generally speaking, a legislative action is the formulation of a rule to be applied in all future cases, while an adjudicatory act involves the actual application of such a rule to a specific set of existing facts." (*Strumsky*, at p. 34, fn. 2.) The touchstone is

_____

[8] Under *Tidewater*, the distinction is more nuanced than simply legislative versus adjudicative, in that a rule interpreting existing law (an interpretive regulation) may require rulemaking even though it is not "adopt[ed] . . . pursuant to delegated legislative power." (*Tidewater*, *supra*, 14 Cal.4th at pp. 574–575; see *Alvarado v. Dart Container Corp. of California* (2018) 4 Cal.5th 542, 556.) There is no question, however, that an agency's adjudicative actions do not qualify as regulations under the APA.

19

whether the rule will apply in more than one set of circumstances, not merely whether it relates to a particular regulated item. (See *Pitts v. Perluss* (1962) 58 Cal.2d 824, 834 ["the distinction between the quasi-legislative and quasi-judicial decision contemplates the function performed rather than the area of performance"].) Other decisions Dow attempts to analogize to this case are not to the contrary. (See *Faulkner v. Cal. Toll Bridge Authority* (1953) 40 Cal.2d 317, 321–324 [agency's approval of bonds for construction of single bridge not regulation because pertained to specific project]; *Pacific Gas & Electric Co. v. Department of Water Resources* (2003) 112 Cal.App.4th 477, 505–507 [agency's mechanism for recovering costs from "discrete project" not regulation because would not apply in future].)

Similarly, the fact that Dow is the only registrant of 1,3-D for use in California does not establish that the township cap program is insufficiently general to qualify as a regulation. It may be that a condition of one party's registration of a single pesticide does not apply generally if it governs only that party's actions. Here, however, the MOU states that the township cap program will apply to any other future registrants of 1,3-D products. And more importantly, the MOU requires Dow to ensure "the township caps are not exceeded" when deciding whether to approve the recommendation of a licensed pest control advisor, and a Dow-approved recommendation is a prerequisite to submitting a notice of intent to a commissioner.[9] In other

---

[9] Similarly, revised Appendix J requires commissioners to reject a notice of intent "if the proposed application [adjusted total pounds] exceeds the available use limit balance in a township." The parties disagree about whether the recommended permit conditions are binding on the commissioners, but we need not resolve this dispute. As Dow and the Department point out, in theory a notice of intent cannot be submitted to a commissioner without a Dow-approved recommendation of a licensed pest control adviser. Thus, even if a commissioner could choose not to adopt all

words, every operator who wishes to apply 1,3-D must obtain Dow's approval, and Dow is required to withhold approval for any application that would exceed the local cap in a given year. The program thus imposes statewide limits on the use, and users, of 1,3-D.

The Department argues that, to the contrary, the MOU "does not place restrictions on . . . end-users" because it "will impact 1,3-D use in a township only when use exceeds the numeric limit on supply in that township. Generally, any such impacts are speculative and depend on the user and the township that [the] user is in. By contrast, [Dow] is the only entity with a direct and immediate change to its obligations under the MOU." But an agency rule is no less "generally applicable" just because the specific parties against which it could be enforced are not identified when it is promulgated. The township cap program may never affect a given operator in the sense of preventing the operator from using the amount of 1,3-D it wants to, but the program still *applies* to all operators in the state who seek to use the pesticide. Thus, while we agree with the Department that the program is not generally applicable merely because it impacts the public at large by protecting against the "risks of long-term exposure to 1,3-D" (see *Faulkner v. Cal. Toll Bridge Authority*, *supra*, 40 Cal.2d at pp. 323–324), its impact on users of 1,3-D is significantly more concrete.

Finally, accepting the Department's argument would mean that an agency could avoid formal rulemaking by contracting with a regulated party to implement the rule. We agree with the trial court, however, that "a state regulation that is implemented through a private intermediary is still a regulation." The fact that Dow happens to be the only registrant of 1,3-D in

---

the recommended permit conditions, Dow can still ensure township caps are not exceeded.

21

California does not mean the Department can informally regulate the pesticide at will so long as its rules are implemented as conditions of Dow's registration. In sum, the township cap program is a rule of general application.

### D. *The Second* Tidewater *Requirement*

For a rule to qualify as a regulation under the second prong of *Tidewater*, it "must 'implement, interpret, or make specific the law enforced or administered by [the agency].' " (*Tidewater*, *supra*, 14 Cal.4th at p. 571.) The trial court did not analyze this issue, viewing it as uncontested. We agree there can be no real dispute that the township cap program implements the law regulating pesticides, which the Department is responsible for enforcing. (*Californians for Alternatives*, *supra*, 136 Cal.App.4th at p. 1056.) The purpose of that law is "to provide for the proper, safe, and efficient use of pesticides essential for production of food and fiber, and to protect the public health and safety, as well as the environment, from harmful pesticides by ensuring proper stewardship of those pesticides." (*Ibid.*, citing § 11501.) Setting a township cap of 136,000 adjusted pounds as the maximum amount of 1,3-D that may safely be applied in a given year "make[s] specific" the law requiring the Department to regulate as "restricted materials" pesticides that may be especially hazardous. (§ 14001 et seq.)

Dow claims that the township cap program nevertheless does not meet the second *Tidewater* requirement because the documents describing the program "simply provide guidance . . . regarding certain conditions . . . that, if unsatisfied or violated, would potentially cause [the Department] to take appropriate action against [Dow's] product registrations." According to Dow, because in the MOU the Department did not *promise* either to cancel Dow's registrations if the company failed to enforce the township cap or not to

cancel the company's registrations if it did comply with this condition, the documents at issue did not affect the Department's already-existing authority over registrations. But Dow incorrectly focuses on the mechanism by which the township cap program was implemented instead of on the program's practical effect. The program is a rule governing how 1,3-D will be used, not a rule governing how the Department will register pesticides. As such, it clearly implements and makes specific the law the Department administers.

### III.
#### DISPOSITION

The writ of mandate and judgment in favor of plaintiffs are affirmed. Plaintiffs are awarded their costs on appeal.

23

_____
Humes, P.J.

WE CONCUR:


_____
Banke, J.


_____
Sanchez, J.

*Vasquez v. California Dept. of Pesticide Regulation* A154922

24

Trial Court:

Superior Court of the County of Alameda

Trial Judge:

Hon. Winifred Y. Smith

Counsel for Intervener and Appellant:

Stanley W. Landfair, David R. Simonton, Robert S. Schuda, Jessica L. Duggan, Dentons US; Trenton H. Norris, Sean M. SeLegue, Arnold & Porter Kaye Scholer

Counsel for Plaintiffs and Respondents:

Michael Meuter, Aaron Voit, Daniel Nesbit, California Rural Legal Assistance; Michael Freund, Michael Freund & Associates

Counsel for Defendant and Respondent:

Xavier Becerra and Rob Bonta, Attorneys General, Robert W. Byrne, Senior Assistant Attorney General, Annadel A. Almendras, Supervising Deputy Attorney General, Marc N. Melnick, Tamara T. Zakim, Deputy Attorneys General

*Vasquez v. California Dept. of Pesticide Regulation*  A154922

25