Filed 4/29/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| RAPTORS ARE THE SOLUTION,<br>     Plaintiff and Respondent,<br>v.<br>CROPLIFE AMERICA et al.,<br>     Intervenors and Appellants. | A171537<br><br>(Alameda County<br> Super. Ct. No. RG18908605) |

Raptors Are the Solution (Raptors), an environmental organization founded to protect wildlife from the toxic effects of pesticides, challenged decisions of the Department of Pesticide Regulation (Department or DPR) to renew and not to reevaluate certain rodenticides, claiming the Department had failed to comply with the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA) and its own regulations in making those decisions. Trade associations that represented developers, manufacturers, formulators and distributors of those products intervened to defend the Department's decisions against Raptors' challenge, claiming they and their members had direct pecuniary interests in the Department's registrations of their products. After lengthy litigation that included proceedings in both the trial and appellate courts, Raptors prevailed in significant part, the Department placed five of the challenged rodenticides into reevaluation and the Governor signed legislation placing a moratorium on their use while the reevaluation proceedings were pending.

This appeal concerns Raptors' motion for attorney fees under the private attorney general statute as the successful party in the action. The trial court awarded fees to Raptors and imposed joint and several responsibility for them on the Department, a group of pesticide companies designated as real parties in interest and the trade associations who intervened and participated in the defense from early on in the case. The trade associations alone appeal from the trial court's fee award. They assert they cannot be liable for fees because they did not make the policy decisions that caused Raptors to file suit. Further, they now claim they lack the very same direct and pecuniary interests they previously informed the trial court they had when arguing they were entitled to intervene. The trial court took them at their word the first time, found they had a direct interest in the litigation and awarded the fees against them and the other parties that defended the case. The trade associations fail to show the trial court erred, and we therefore affirm.

## BACKGROUND[1]

"On December 22, 2017, in response to the Department's proposed decision to renew rodenticide registrations for 2018, Raptors requested that the Department initiate reevaluation of three first-generation anticoagulant rodenticides (FGARs) and four second-generation anticoagulant rodenticides (SGARs).[2] Raptors argued that the continued use of these rodenticides posed a significant risk and/or is likely to have significant cumulative impacts on wildlife, and that the Department was

---

[1] Where indicated *infra*, we quote our slip opinion from the prior appeal, *Raptors Are the Solution v. Cal. Department of Pesticide Regulation* (Sept. 27, 2022, A161787) [nonpub. opn.]) (*Raptors I*), for portions of the background facts and procedural history.

[2] The three FGARs [were] diphacinone, chlorophacinone and warfarin. The four SGARs [were] brodifacoum, bromadiolone, difethialone, and difenacoum. Anticoagulant rodenticides generally work by disrupting the blood-clotting mechanism in the target animal, which causes hemorrhaging and ultimately leads to death."

therefore required to reevaluate these rodenticides pursuant to [Cal. Code Regs., tit. 3,] section 6220.  Raptors attached several exhibits to its request and provided additional information and data over the course of the next several months in support of its request for reevaluation.

"In March 2018, the Department responded to Raptors that it was 'in the process of reviewing data submitted by the California Department of Fish and Wildlife and wildlife organizations' to determine the potential adverse impacts of the continued use of FGARs and SGARs on non-target wildlife.  The Department further wrote that it was 'proceeding with the renewal of [the seven rodenticides] and will not be placing them into reevaluation at this time.'  On April 18, 2018, the Department published a 'Final Decision Regarding Renewal or Registration of Pesticide Products for 2018' that confirmed its decision to renew the subject rodenticides without reevaluation.[3]

"On June 13, 2018, Raptors filed a verified petition for writ of mandate.  The petition alleged two causes of action against the Department for violation of the California Environmental Quality Act (CEQA) and violation of the Department's own regulations based on its decision to renew the subject rodenticides for 2018 without reevaluation.  On October 19, 2018, Raptors filed an amended petition that added various agencies and companies as real parties in interest.  These parties

---

[3] The statute regulating pesticides defines "pesticide" broadly to include rodenticides.  (See Food & Agr. Code, § 12753, subd. (b) ["Any substance, or mixture of substances which is intended to be used for defoliating plants, regulating plant growth, or for preventing, destroying, repelling, or mitigating any pest, as defined in Section 12754.5, which may infest or be detrimental to vegetation, man, animals, or households, or be present in any agricultural or nonagricultural environment whatsoever"]; *id*. § 12754.5, subd. (a) [defining "pest" to include "[a]ny . . . rodent"].)

3

had all received a renewal from the Department for one or more of the seven challenged rodenticides for 2018.

"On November 16, 2018, the Department wrote to Raptors' counsel that it had completed its investigation of the subject rodenticides in response to Raptors' request and that it would begin reevaluation of SGARs, but not FGARs. The Department reasoned that its 'investigation of the reported impacts found that the rate of FGAR exposure among non-target wildlife is generally decreasing and is lower than for SGARS.' The letter was accompanied by a 35-page report that summarized the Department's investigation of FGARs and SGARs based on the data submitted and its reasons for placing SGARs into reevaluation but not FGARs. At the same time, the Department published its proposed decision to reevaluate the four SGARs."

In response to that decision and to an order sustaining the Department's demurrer with leave to amend, Raptors filed a second amended petition in May 2019 limiting its challenge to the Department's April 2018 decision to renew the registration of one of the three FGAR rodenticides known as diphacinone without reevaluation and its November 2018 decision not to reevaluate diphacinone.

In the meanwhile, in March 2019 appellants CropLife America/Responsible Industry for a Sound Environment (CropLife) and Western Plant Health Association (collectively, proposed Intervenors or Intervenors), which are trade associations,[4] moved to intervene in the action. Proposed Intervenors declared that

---

[4] CropLife America is "a nonprofit trade association representing more than 50 developers, manufacturers, formulators and distributors of crop protection products." Responsible Industry for a Sound Environment or RISE is "a standing committee of CLA [CropLife America] that serves as the national not-for-profit trade association representing more than 220 producers and suppliers of specialty pesticide and fertilizer products sold to both the professional and consumer markets." "WPHA [Western Plant Health Association] is a voluntary nonprofit

4

they represent "the developers, manufacturers, formulators and distributors of plant science solutions for agriculture and pest management in the United States." In their brief, they asserted CropLife's "member companies produce, sell and distribute virtually all the crop protection products used by American farmers, ranchers and landowners to ensure healthy crops and strong yields," have "invested in the generation and submission of voluminous data, studies and analyses to support their registrations," have "participated extensively in EPA [Environmental Protection Agency] and DPR's registration processes" and have "invested significant amounts into producing and marketing their rodenticide products."

Intervenors sought intervention based on the criteria for intervention as a matter of right under Code of Civil Procedure section 387.[5] They argued, "[t]he Motion should be granted because Proposed Intervenors and their members collectively have an economic and representational interest in the matter in litigation that will be impacted by the issues raised, and will be particularly impacted if the relief sought in Petitioner's challenge to the administrative action by the Department of Pesticide Regulation ('DPR') affecting the annual renewal without conducting a reevaluation of rodenticide registrations of products containing the active ingredients known as: (1) brodifacoum; (2) bromadiolone; (3)

---

association that represents the interests of fertilizer and crop protection manufacturers, biotechnology providers, distributors and agricultural retailers in California, Arizona and Hawaii," and its "members comprise more than 90% of all the companies marketing plant nutrients, soil amendments, agricultural minerals and crop protection products including rodenticides in California, Arizona and Hawaii."

[5] Code of Civil Procedure, section 387, subdivision (d)(1)(B) sets out the criteria for intervention as of right. It requires a court to permit a nonparty to intervene if that person "claims an interest relating to the property or transaction that is the subject of the action," and "is so situated that the disposition of the action may impair or impede [their] ability to protect that interest, unless [their] interest is adequately represented by one or more of the existing parties."

difethialone; (4) difenacoum; (5) diphacinone; (6) chlorophacinone; and (7) warfarin (hereafter referred to cumulatively as 'rodenticides'), is granted."

They asserted their "members [were] directly impacted by the outcome of this litigation, given their pecuniary interest if DPR cannot renew products prior to a request for reevaluation," and that "Proposed Intervenors' interests are not adequately represented by the other parties to the litigation." They described their own and their members' interests as "immediate, direct and substantial." "First, regarding the rodenticides named in this litigation, if Petitioner is successful in its claims for injunctive relief, the result is an effective cancellation of these products, resulting in loss of sales, and an expensive and lengthy recall process. Accordingly, Proposed Intervenors' members stand to lose or gain by direct operation of the judgment in this case. [Citation.] [¶] An even greater impact, however, is the likelihood of numerous reevaluation requests to DPR with the intent of triggering a CEQA review that would bar timely renewal of existing lawful pesticide registrations. Proposed Intervenors' members have expended significant funds in the registration process both at the federal level and in California. Proposed Intervenors' members would now face the risk of an effective cancellation of numerous products, despite their compliance with California law because of the impossible time constraints to conduct the review Petitioners seek within the 60-day renewal timeframe."

Intervenors also contended the individual companies Raptors had designated as real parties in interest were "not . . . best equipped to address the impact that nullification of their registrations and the potential nullifications of registrations for other products would have on Proposed Intervenors, their members, California growers and the State's agricultural economy." Intervenors suggested they needed to intervene to protect the broader interests at stake, specifically, "the continued viability of all [their] members' products and the legal integrity of the registrations

6

its members have obtained from the U.S. Environmental Protection Agency . . . and [the Department]." They asserted that they and their members "have a substantial interest in the matter in litigation, such that they will either gain or lose by the legal operation and effect of the judgment in that they are impacted by the issues raised" that "is not adequately represented by the other parties to the action."

The motion was unopposed. On June 18, 2019, citing Intervenors' assertions that "they and their members have a substantial interest in the matter in litigation," the trial court granted it.

About a week later, the parties, including Intervenors, stipulated to dismiss the first cause of action in Raptors' second amended petition challenging the decision to renew diphacinone without registration, reserving Raptors' right to appeal the trial court's order sustaining the demurrer to a similar cause of action in the previous petition.

From March 2020 through July 2020, the parties filed briefs on the merits of the second amended petition. All of the parties, including Intervenors, filed briefs and participated in the argument. On November 17, 2020, after hearing arguments, the court denied the second amended petition on the merits.

Thereafter, the trial court entered judgment and Raptors appealed. On appeal, again, all parties, including Raptors, Intervenors and Real Parties, along with two amici curiae, filed briefs. Intervenors also participated along with Raptors, the Department and Real Parties in the appellate oral argument.

In an unpublished opinion issued in September 2022, we reversed the trial court decision and remanded the case with instructions to issue a writ of mandate directing the Department to reconsider its decision not to place diphacinone into reevaluation, after addressing the particular characteristics of diphacinone relevant to its impact on the environment, including its prevalence, toxicity, effects on non-target wildlife, and performing a cumulative impact of its interaction with

7

other rodenticides on non-target wildlife. We directed that the Department should be ordered not to minimize any adverse effects of diphacinone by grouping it or comparing it with other rodenticides.

Following remand, the Department agreed to place diphacinone into reevaluation. Raptors participated in the legislative process with the result that the Legislature adopted Assembly Bill 1322 (2023-2024 Reg. Sess.), placing a moratorium on use of diphacinone pending completion of the reevaluation process.[6] Assembly Bill 1322 (2023-2024 Reg. Sess.) went into effect on January 1, 2024.

Raptors attempted to negotiate a resolution of its entitlement to attorney fees and costs with the Department and ultimately with Intervenors and Real Parties as well. Unable to reach agreement with any of the parties, Raptors filed a motion seeking to recover its fees and costs under the private attorney general doctrine codified in Code of Civil Procedure section 1021.5 (section 1021.5).

The Department opposed the motion, arguing, among other things, that Raptors was not the successful party because the court had not yet entered judgment in Raptors' favor. It further argued that Raptors hadn't conferred a significant benefit on the public for the same reason and because: (1) the Department had initiated reevaluation for reasons independent of the Court of Appeal decision, (2) the reevaluation was not yet complete, (3) it was unclear whether the Department would ultimately impose restrictions on diphacinone use and (4) the court action did not cause the Legislature to enact the moratoria. The Department made alternative arguments in the event the court granted Raptors' fees. It argued the lodestar should be reduced because the time Raptors spent early

---

[6] After the Department agreed to revaluate the four SGARs, in response to Raptors' filing of the first amended petition, the Legislature enacted and the Governor signed a similar bill, Assembly Bill 1788 (2019-2020 Reg. Sess.), imposing a moratorium on the use of the SGARs pending reevaluation.

8

in the litigation (prior to filing the second amended petition), which was unsuccessful, was not reasonably spent or should be deducted because it reflected the case was only partially successful. Further, it argued that if the court awarded fees, they should be awarded against all opposing parties, including Real Parties and Intervenors, rather than the Department alone, either jointly and severally or by apportioning them between the Department and the Real Parties and Intervenors.

Intervenors opposed the motion claiming they were not opposing parties who could be liable for attorney fees, Raptors was not a successful party as against Intervenors, if the court awarded fees, it should award them against the Department only and any award should be reduced because the Raptor attorneys' hours were "inflated."

Besides opposing Raptors' motion, Real Parties filed a motion seeking to recover their own attorney fees, claiming they had prevailed on certain issues.

In July 2024, the court issued a seven-page, single-spaced decision granting Raptors' motion in significant part. It held that "[Raptors] is the prevailing party because it achieved the goal of its [second amended petition]." The court observed that the Department had placed diphacinone and the four SGARs into reevaluation. It rejected the Department's contention that Raptors had not prevailed because no judgment had formally been entered, observing that the Department's "hyper-technical argument ignores the practical reality that this court must enter judgment as required by the Court of Appeal" and "[t]he only reason judgment was not entered was because [the] parties were attempting to negotiate the form of judgment and resolution of attorney's fee claims."

The court found that "[Raptors'] writ petition conferred a significant public benefit that resulted in the enforcement of an important right affecting the public interest." Specifically, the action "resulted not only in the [Department's]

9

reevaluation of anti-coagulant rodenticides but also led in part to the passage of Assembly Bill 1322 [(2023-2024 Reg. Sess.)] that placed a moratorium on the use of Diphacinone pending completion of the reevaluation process."

The court rejected the Department's "claim that it commenced re-evaluation independently from the mandate of the Court of Appeal" as "not credible." It further noted that "the Legislature's subsequent action was motivated, at least in part, by the Court of Appeal's decision, as is clear from the legislative history." The court concluded by stating, "[t]he ultimate result in this case is what [Raptors] sought. It matters not that the court of appeal did not adopt every theory asserted. What matters is the result. CEQA was vindicated and re-evaluation was the result." Raptors was therefore "entitled to an award of attorney's fees that were reasonably incurred in the success of this action."

The court then considered "what portion of the requested fees were reasonably incurred in connection with the success of [Raptors'] enforcement action." The Department did not challenge the hourly rates Raptors sought, and the trial court found them to be reasonable. The court reduced the fees by deleting those incurred prior to Raptor's filing of the second amended petition, reasoning that the Department prevailed on its demurrer to the first amended petition and that Raptors could not claim it was a catalyst under *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 577 because it failed to show it made a settlement offer before serving the first amended petition. This resulted in a reduction of the lodestar amount from about $833,000 to about $656,000.[7] The court then applied a multiplier of 1.3 to the lodestar for contingent risk (rejecting any multiplier based on the difficulty of the case, the skill in presenting them or the success being extraordinary) and, after adding costs of about $4,800, awarded fees and costs totaling about $857,000.

---

[7] Raptors has not cross-appealed or otherwise challenged this reduction.

10

The court awarded that amount jointly and severally against the Department, Real Parties and Intervenors.  Rejecting Intervenors' arguments, it found that they "actively sought to intervene in this action, opposed [Raptors'] Opening Brief, obtained protective orders and have opposed [Raptors'] motion for attorney's fees" and "their participation went beyond merely arguing that re-evaluation is not required before annual renewal."  The court further found that, "[h]ere, all opposing parties"—including Intervenors—"have a direct interest in this litigation and actively opposed [Raptors'] actions throughout this litigation, requiring [Raptors] to respond."  The court noted that while the Department had expressed the view that the award should be apportioned between the opposing parties and the court had "encouraged these parties to come to an agreement in this regard," it was "clear . . . that the Real Parties and Intervenors did not agree to [the Department's] proposed allocation."  It thus declined "to impose an allocation that requires Petitioner to engage in extensive collection activities."

## DISCUSSION

Intervenors alone appeal the trial court's fee award; neither the Department nor Real Parties appealed.  Intervenors argue, as they did in the trial court, that they are not "opposing parties" who may be liable for attorney fees under section 1021.5 and that Raptors was not a successful party as against them.  They also contend the trial court abused its discretion by not reducing the award based on Raptors' "limited success" and by awarding the fees jointly and severally instead of apportioning them based on what Intervenors describe as their "limited participation" in the case.

### I.

### *The Private Attorney General Doctrine*

The private attorney general doctrine refers to the doctrine allowing awards of attorney fees "to those who by litigation secure benefits for a broad class of

11

individuals by effectuating a strong public policy." (*Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 505.) "The fundamental objective of the private attorney general doctrine is to encourage suits enforcing important public policies by providing substantial attorney fees to successful litigants in such cases." (*Vargas v. City of Salinas* (2011) 200 Cal.App.4th 1331, 1339.)

The doctrine is codified in a number of California statutes, the broadest being section 1021.5. That section provides in relevant part, "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

"The preliminary consideration under section 1021.5 is the plaintiff's success." (*Vargas, supra*, 200 Cal.App.4th at p. 1339.) "When it comes to section 1021.5, the successful party is 'the party to litigation that achieves its objectives.'" (*La Mirada Avenue Neighborhood Assn. of Hollywood v. City of Los Angeles* (2018) 22 Cal.App.5th 1149, 1157.) "This definition is both 'pragmatic' and 'broad.' [Citation.] To be the successful party, a party need not obtain final judgment in its favor. [Citations.] It need not succeed on all of its claims. [Citation.] And it need not 'personally benefit[]' from its success. [Citations.] Indeed, because the 'critical fact' to success 'is the impact of the action, not the manner of its resolution' [citation], the party need not 'win' the lawsuit at all: It is enough to show that the lawsuit was a 'catalyst' that motivated the defendant to

12

alter its behavior, be it through voluntary action growing out of a settlement or otherwise." (*Ibid*.)

## II.

### *Connerly v. State Personnel Bd. (2006) 37 Cal.4th 1169 (Connerly)*

As we shall discuss, Intervenors focus most heavily in their challenge to the fee award on the *Connerly* case, in which our high court addressed the meaning of the phrase "opposing parties" against whom fees can be awarded under section 1021.5. We discuss it briefly here and in more depth below.

Ward Connerly had sued several state agencies to invalidate several statutory programs under the federal Constitution and Proposition 209 (Initiative Measure (approved Nov. 5, 1996, eff. Nov. 6, 1996)), an initiative measure that bars government preferences based on race, sex and other categories. (*Connerly*, *supra*, 37 Cal.4th at p. 1172.) The state largely declined to defend the challenged programs, and "[i]t fell to various amici curiae advocacy groups that were in favor of affirmative action to defend the state programs and statutes on the merits." (*Ibid*.) The court described the advocacy groups as "[a] group of organizations and associations who were generally in favor of the challenged programs, the California Business Council for Equal Opportunity, California Coalition of Hispanic Organizations, California Hispanic Chamber of Commerce, California Teachers Association, Hispanic Contractors Association, and Society of Hispanic Professional Engineers, Greater Los Angeles Chapter" which obtained permission to participate as amicus curiae and did so actively. (*Id*. at p. 1173.)

After Connerly prevailed in significant part, the trial court awarded him attorney fees, which it apportioned one sixth each among the five state government entities with programs that had been challenged and the remaining one sixth portion to the group of organizations who had participated as amicus curiae in defense of the programs. (*Connerly*, *supra*, 37 Cal.4th at pp. 1173-1174.) The

13

amicus appealed from the award of fees against them, and the court of appeal affirmed. (*Id.* at pp. 1174-1175.)

Our Supreme Court granted review to decide whether the advocacy organizations "can be assessed attorney fees under section 1021.5 as an 'opposing party[]' within the meaning of that statute." (*Connerly*, *supra*, 37 Cal.4th at p. 1175.) The court observed that " 'the normal standard of review' " in a challenge to an attorney fee award is abuse of discretion, but that " 'de novo review . . . is warranted where the determination of whether the criteria for an award of attorney fees and costs in this context have been satisfied' " because it turned on " 'statutory construction' " that was " 'a question of law.' " (*Ibid.*) The facts there were undisputed, and the court recognized that in some circumstances "this may be a mixed question of law and fact and, if factual questions predominate, may warrant a deferential standard of review." (*Ibid.*)

### III.

### *Standard of Review*

"Whether plaintiff established its eligibility for fees under section 1021.5 implicates 'a mixed standard of review: To the extent we construe and define the statutory requirements for an award of attorney's fees, our review is de novo; to the extent we assess whether those requirements were properly applied, our review is for an abuse of discretion.' [Citation.] 'The pertinent question is whether the grounds given by the court for its denial [or grant] of an award are consistent with the substantive law of section 1021.5 and, if so, whether their application to the facts of th[e] case is within the range of discretion conferred upon the trial courts under section 1021.5, read in light of the purposes and policy of the statute.' " (*Friends of Spring Street v. Nevada City* (2019) 33 Cal.App.5th 1092, 1107 (*Friends of Spring Street*).)

14

## IV.

### *Trial Court's Primary Findings*

The trial court held, based on a series of specific findings, that Raptors met the eligibility requirements for an award under section 1021.5. As the trial court observed, Raptors "achieved the goal of its SAP [second amended petition]." It challenged both the Department's "renewal of Diphacinone's registration and [its] decision to renew Diphacinone's registration without first conducting a re-evaluation of Diphacinone. CEQA was the basis for [Raptors'] challenges to [the Department's] renewal-without-reevaluation. Following the Court of Appeal's decision reversing the trial court's denial of [Raptors' second amended petition], [the Department] placed Diphacinone and four additional rodenticides into reevaluation . . . ."

Raptors' litigation also led to the Department's placement of the four SGARs into reevaluation and to the Legislature enacting legislation placing a moratorium on the use of the four SGARs and diphacinone pending completion of the Department's reevaluation process.[8] "Here, there is no question that [Raptors'] writ petition was brought to enforce certain provisions under CEQA and to protect the non-target wildlife that was being harmed by the ingestion of anti-coagulants contained in rodenticides such as Diphacinone." "The ultimate result in this case is what [Raptors] sought. . . . CEQA was vindicated and reevaluation was the result."

Intervenors do not contend Raptors was not the prevailing party or that it did not confer a significant benefit on the general public or satisfy the other criteria entitling it to private attorney general fees. Instead, they argue, first, that they

---

[8] Further, as indicated in our unpublished opinion on the merits of the case, the four SGARS and diphacinone, which the Department agreed to reevaluate, are the rodenticides that appear to pose the greatest risk of significant adverse effects on wildlife.

15

were not "opposing parties" under section 1021.5, relying heavily on *Connerly*, *supra,* 37 Cal.4th 1169; second, that although Raptors was successful in the litigation generally, it was not successful *against Intervenors*; third, that the court should have reduced the fee award based on Raptors' "limited success" and as "unreasonable"; and fourth, that the court abused its discretion in holding Intervenors jointly and severally liable for the full fee award.

## V.

### *Intervenors' Stealth Attacks on the Trial Court's Findings Lack Merit.*

Nowhere in their brief do Intervenors argue that any of the trial court's findings lacked substantial evidence. However, underpinning their various legal arguments are characterizations of facts that serve as premises for those arguments. Before turning to their legal arguments, we address these sub rosa attacks on the trial court's findings.

In arguing they were not "opposing parties" against whom a fee award may be made under section 1021.5, Intervenors seek to portray themselves as lacking "a direct interest" in this litigation and having intervened for only a "limited purpose" that was "policy-based" "to uphold . . . [public] policy interests." Specifically, they claim they sought to intervene " 'for the limited purpose of advising the Court of the need to follow the Department's regulatory requirements for reevaluation without interfering with the shortened time for renewal.' " They further assert their participation in the case was "very limited" consistent with that "limited purpose."

In support of Intervenors' arguments that the trial court should have reduced the fee award and should not have apportioned any part of it to them, Intervenors characterize Raptors' success in the case as "limited," claim it was entirely unsuccessful as to them, and even claim they themselves "prevailed against [Raptors] on the narrow issue for which they appeared in this case—to protect the distinction between the Department's pesticide registration renewal and

16

reevaluation procedures and uphold *CATS* [*Californians for Alternatives to Toxics v. Dept. of Pesticide Registration* (2006) 136 Cal.App.4th 1049]."

Intervenors' factual recitation is squarely contrary to many of the trial court's findings. Presenting their own very different version of the "facts" is not a proper way to challenge to those findings. Intervenors' approach violates bedrock appellate principles. "The normal rules of appellate review apply to an order granting or denying attorney fees . . . ." (*Apex, LLC v. Korusfood.com* (2013) 222 Cal.App.4th 1010, 1017.)

"The most fundamental rule of appellate review is that an appealed judgment or order is *presumed to be correct*. [Citation.] 'All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.' [Citations.] This includes the presumption 'that the record contains evidence to support every finding of fact.' " (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2025) ¶ 8:15 (Dec. 2025 Update).) "[C]onflicts in the evidence are resolved in favor of the prevailing party and the trial court's resolution of factual disputes is conclusive." (*Apex LLC v. Korusfood.com, supra,* 222 Cal.App.4th at p. 1017.) We "review the record in the light most favorable to the judgment." (*Fortman v. Hemco, Inc.* (1989) 211 Cal.App.3d 241, 259; see *Leung v. Verdugo Hills Hospital* (2012) 55 Cal.4th 291, 308.)

An appellant has the burden of overcoming the presumption of correctness and must provide an adequate appellate record demonstrating the claimed error. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.) The appellant must place each argument under an appropriate heading and support it with reasoning supported by legal authority. (*Dilbert v. Newsom* (2024) 101 Cal.App.5th 317, 323; Cal. Rules of Court, rule 8.204(a)(1)(B).) This includes a discussion of the standard of review that applies and why any challenged findings fail to meet that standard.

17

Further, when challenging the sufficiency of the evidence, an appellant must include in the opening brief a fair and complete statement of all facts supporting the judgment or order on appeal. "A party who challenges the sufficiency of the evidence to support a finding must set forth, discuss, and analyze all the evidence on that point, both favorable and unfavorable." (*Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218.) It was thus incumbent on Intervenors, if they wished to challenge the findings, to set forth a fair recitation of all the evidence material to the fee issues, "not only facts favorable to [them]." (*Oakland Bulk & Oversized Terminal, LLC v. City of Oakland* (2025) 112 Cal.App.5th 519, 544.) Failure to do so forfeits review of the findings. (*Schellinger Brothers v. Cotter* (2016) 2 Cal.App.5th 984, 998; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) Likewise, Intervenors' failure to provide any argument that the trial court's findings are not supported by substantial evidence is a further ground for forfeiture.[9]

Even if we reached the sufficiency of the evidence to support the trial court's findings, we would find Intervenors' sub rosa attack on them meritless. First, the trial court's finding that "all opposing parties," including Intervenors, "have a direct interest in this litigation," is amply supported by the evidence in the record, most significantly, Intervenors' own repeated assertions in their motion to intervene. In that motion, they asserted that they are trade associations made up of members that include most American pesticide developers and distributors and that, as such, they have an interest in the case that is "immediate, direct and substantial" and

---

[9] Raptors does not argue waiver and endeavors to set the record straight regarding Intervenors' factual recitations. Nonetheless, in light of Intervenors' complete and utter failure to comply with basic appellate principles in their discussion of facts and the absence of any substantial evidence argument, we hold that they forfeited any challenge to the trial court's findings, which are therefore binding on this court.

"pecuniary" and "economic" in nature.  Indeed, Intervenors suggested that because their members "produce, sell and distribute virtually all the crop protection products used by American farmers, ranchers and landowners," they were better equipped than the individual pesticide producers and suppliers that had been named as real parties in interest in the case to "ensure the continued viability of all [their] members' products and the legal integrity [of their registrations]." Intervenors' factual assertions in opposition to the fee motion, seeking to avoid responsibility for the award, fly in the face of their earlier statements in their declarations, briefs and complaint in intervention and contradict other evidence in the record.  The trial court was not required to credit the former rather than the latter.  (See pp. 4-7, *ante*.)

Ample evidence also supports the trial court's findings that Intervenors "actively sought to intervene in this action, opposed [Raptors'] Opening Brief, obtained protective orders and . . . opposed [Raptors'] motion for attorney's fees" and that their "participation *went beyond* merely arguing that re-evaluation is not required before annual renewal."  (Italics added.)  As Raptors points out, "[f]ollowing intervention, they actively participated in every proceeding as the litigation progressed," including, first, by filing "a full opposition to Raptors' writ brief on the merits."  Their brief argued that annual renewal of registration for a pesticide is a ministerial act for which CEQA compliance is not required and that the Department is not required to conduct the full assessment for reevaluation within the 60-day renewal window.  However, it went beyond the issue Intervenors argue was their reason for intervening and contended that the evidence did not support Raptors' request for reevaluation of diphacinone and that the Department's investigation of diphacinone's effects on non-target wildlife was sufficient.

Intervenors continued to make both arguments on appeal, filing two briefs in this court:  the first a "respondent's brief" on the merits addressing Raptors' CEQA

19

arguments and arguing the sufficiency of the Department's analysis of diphacinone's effects, and the second, a brief responding to amici. Only the second addressed Intervenors' so-called "policy argument"[10] that renewal of registration should not be delayed to determine whether to reevaluate. Intervenors also participated in the appellate argument.

Another less than candid assertion Intervenors make on appeal in support of the claim that their participation in the case was limited is that Raptors, the Department and Real Parties "litigated this case for more than two years before the Associations intervened." This is inaccurate. Raptors filed its initial petition for writ of mandate on June 13, 2018, and Intervenors filed their motion intervene within nine months thereafter (on March 20, 2019),[11] shortly before Raptors filed its second amended petition. Intervenors conveniently omit to mention that the trial court awarded *no fees* for any time spent before the second amended petition was filed. Thus, the only fees it awarded against Intervenors or any other party were for work performed during the years spent on the case *after* Intervenors filed their motion to join in the case.

In short, the record in this case amply supports the trial court's findings on the facts material to whether Raptors was eligible for a fee award and whether Intervenors were opposing parties against whom fees could be assessed. Even if

---

[10] We do not accept Intervenors' characterization of the renewal issue as a "policy argument" divorced from any direct pecuniary interest. Again, this is contrary to their repeated assertions in their motion to intervene that this was a matter in which they and their members had a direct interest of a pecuniary nature.

[11] A careful reading of the opening brief suggests the "two years" to which Intervenors refer includes Raptors' participation in the administrative process. Even so, December 2017 to March 2019 amounts to a year and three months, not "more than two years."

20

Intervenors had not forfeited any substantial evidence challenge, we would reject it.

## VI.

### *Intervenors Are "Opposing Parties" Under Section 1021.5.*

As noted earlier, Intervenors contend our Supreme Court's holding in *Connerly* that the amicus curiae in that case was not an opposing party requires reversal of the trial court's award of fees against it. They describe *Connerly* as holding that a "group of trade associations" who participated as amici curiae "clearly was not an 'opposing party'." Again, Intervenors' argument is misleading. The court in *Connerly* never referred to any of the amici curiae individually, or the amicus curiae as a group, as "trade associations." Instead, it described the amici as "advocacy groups" (*Connerly, supra,* 37 Cal.4th at p. 1172), as "[a] group of organizations and associations who were generally in favor of the challenged [affirmative action] programs" (*id.* at p. 1173) and as "advocacy groups . . . generally interested in the protection of minority and civil rights." (*Id.* at p. 1177.) Even assuming some of the organizations were trade associations,[12] the court did not rely on their status as such in holding they were not opposing parties. Nor did the court mention any evidence that any of those organizations had any direct or pecuniary stake in the outcome of the case.

The court in *Connerly* did identify two factors, either of which would place an organization in the category of "opposing party" under section 1021.5. The first was whether the organization or person appearing as an amicus curiae is responsible for enacting or enforcing the law challenged in the litigation. (See *Connerly, supra,* 37 Cal.4th at p. 1177.) "By this standard, the [amici curiae group] clearly [was] not

---

[12] For example, the "Product Liability Advisory Council, Inc., which seeks to reform product liability law and counts among its members Chevron Corporation, the Dow Chemical Company, and General Motors Corporation." (*Connerly, supra,* 37 Cal.4th at p. 1177.)

21

an 'opposing party because it was responsible neither for enacting nor enforcing the statutes that were judged to be unconstitutional in the underlying litigation." (*Ibid.*)

Second, the *Connerly* court considered whether the party participating as an amicus was a "real party in interest" meaning " ' "any person or entity whose interest will be directly affected by the proceeding." ' " (*Connerly, supra,* 37 Cal.4th at p. 1178.) This would include " ' "the person or entity in whose favor the acts complained of [operate]" or "anyone having a direct interest in the result" [citation], or "the real adverse party . . . in whose favor the act complained of has been done." ' " (*Ibid.*, quoting *Sonoma County Nuclear Free Zone '86 v. Superior Court* (1987) 189 Cal.App.3d 167, 173.) The type of interest the person or entity must have, the court indicated, is "like a beneficial interest, a 'special interest to be served or some particular right to be protected over and above the interest held in common with the public at large.' " (*Connerly,* at p. 1179.) The amici in *Connerly,* while having "a particular ideological or policy focus that motivates them to participate in certain litigation," fell short. (*Ibid.*) The amicus group's "policy interest in the present case in maintaining some affirmative action programs is no different in kind from that of the typical amicus curiae and no different in substance from like-minded members of the general public." (*Ibid.*)

Intervenors characterize *Connerly* as interpreting section 1021.5 to mean that a person or entity cannot be an opposing party if "it was responsible neither for enacting nor enforcing the statutes that were judged to be unconstitutional in the underlying litigation" even where they actively participate in that case. Intervenors overstate the case by omission. They ignore altogether the second factor *Connerly* held may render a participant in litigation an "opposing party" under section 1021.5: if that participant "advocate[s] a position . . . out of a direct interest in the litigation" rather than based on "its own views of what is legally

22

correct and beneficial to the public interest." (*Connerly, supra*, 37 Cal.4th at p. 1183.)

The court in *Connerly* distinguished several cases Connerly relied on in support of his fee claim against the advocacy groups, in which appellate courts affirmed awards of fees against an entity or person who was neither the party sued nor the entity responsible for enacting the law. Among them are *Bolsa Chica Land Trust v. Superior Court* (1999) 71 Cal.App.4th 493 (*Bolsa Chica Land Trust*),[13] in which the court awarded fees not only against the Coastal Commission and other government agency defendants in a challenge to a local coastal plan (LCP), but also against two landowner/developer real parties in interest whose "developments were authorized by the plan and who participated in the litigation" (*Connerly, supra*, 37 Cal.4th at p. 1180; *Bolsa Chica Land Trust*, 71 Cal.App.4th at pp. 500, 517-518); and *San Bernardino Valley Audubon Society, Inc. v. County of San Bernardino* (1984) 155 Cal.App.3d 738 (*San Bernardino Audubon Society*), in which a local Audubon Society successfully challenged the county's approval of a cemetery claiming it violated CEQA, and the court awarded fees to be paid by both the defendant county and the owner/developer of the property, named as a real party in interest, who actively participated in the litigation (*Connerly,* at pp. 1180-1181; *San Bernardino Valley Audubon Society*, at pp. 745-747, 753-757).

These two cases, cited with approval by the Supreme Court, support the trial court's decision here. In both, the parties were not defendants but were not mere "advocacy groups" seeking to promote an interpretation or policy they believed was in the public interest. Rather, as owners and developers of the affected properties, they were directly affected by the government agencies' challenged actions and actively participated in the cases to defend the government's position. Likewise,

---

[13] Disapproved on other grounds in *Dhillon v. John Muir Health* (2017) 2 Cal.5th 1109, 1114, 1116, fn. 2.

here.  Intervenors were trade associations of pesticide and rodenticide manufacturers and sellers whose businesses were directly affected by the challenged regulation.  The trade associations, by their own admission, have as their "central purpose . . . to ensure *the continued viability of members' products* and *the legal integrity of the registrations members have obtained* from . . . [the Department]."  (Italics added.)  They participated in the litigation precisely to protect their own and their members' "economic and representational interest in the matter in litigation" and their members' "legally protected interests in their registrations," which interests would not adequately be represented by either the Department or individual companies (including some of Intervenors' own members) that were real parties in interest.  Just as the owner/developers in *Bolsa Chica Land Trust* and *San Bernardino Audubon Society* vigorously defended the government defendant's position in the case, with the result that the plaintiff organizations were required to incur attorney fees, so too did Intervenors, both in the trial court and in this court.

In contending they cannot be "opposing parties" for purposes of section 1021.5, Intervenors describe themselves as "innocent," apparently because they were not "the **defendant person or agency sued***, which is responsible for initiating and maintaining actions or policies that are deemed harmful to the public interest and that gave rise to the litigation*."  But, as we have already explained, this is only one of two alternative theories and does not preclude responsibility for attorney fees where an entity "advocates a position out of a direct interest in the litigation" rather than based on some ideological or policy basis.  Here, Intervenors did just that.[14]

---

[14]  Intervenors' reliance on *Independent Federation of Flight Attendants v. Zipes* (1989) 491 U.S. 754 (*Zipes*) is misplaced.  First, *Zipes* interpreted federal law, in particular a statute (42 U.S.C. § 2000e-5(k)) with language entirely different from section 1021.5.  (*Zipes*, at pp. 757-758.)  Second, *Connerly* was decided

Indeed, cases decided after *Connerly* have held that fault is not a requirement for "opposing party status." In *Mejia v. City of Los Angeles* (2007) 156 Cal.App.4th 151, the court upheld a fee award under section 1021.5 assessed against a developer that was the real party in interest in a case that challenged the city's approval of a development project under CEQA. Citing *Connerly*, the court recognized that "a 'party' in an action ordinarily is a plaintiff or defendant," but held that "a real party in interest in a mandamus proceeding also is regarded as a party to the litigation." (*Mejia,* at p. 160.) The "rationale for the holding in *Connerly*," the court explained, "support[ed] [its] conclusion that a real party in interest in a mandamus proceeding that has a direct interest in the litigation, more than merely an ideological or policy interest, and actively participates in the litigation is an opposing party within the meaning of Code of Civil Procedure section 1021.5 and can be liable for attorney fees under the statute." (*Id.* at pp. 160-161.) The court further held that "an award of attorney fees 'to a successful party against one or more opposing parties' (Code Civ. Proc., § 1021.5) *does not require a finding of fault or misconduct by the opposing party*. The statutory language does not contain such a requirement, and courts have recognized that there is no such requirement." (*Id.* at p. 161, italics added, quoting *San Bernardino Audubon Society*, *supra,* 155 Cal.App.3d at p. 756 [" '[F]ees granted under the

---

17 years after *Zipes* and did not embrace its central holding that responsibility for the challenged law or policy is required before a nonparty who intervenes in a case can be liable for fees.

Indeed, *Connerly* distinguished *Zipes* because it involved a union that had "formally *intervened* in litigation," observing, "Under California law, at least, an intervenor is considered a full-fledged party to an action by virtue of the order authorizing the intervention." (*Connerly*, *supra*, 37 Cal.4th at p. 1183, fn. 6.) *Connerly*'s discussion, if anything, undercuts Intervenors' position. It concluded that *Zipes* was inapposite to the case before it, observing not only that the amicus group in *Connerly* "is not an intervenor, and is not acting as a plaintiff pursuing its own pecuniary interest." (*Connerly,* at p. 1183, fn. 6.)

25

private attorney general theory are not intended to punish those who violate the law but rather to ensure that those who have acted to protect public interest will not be forced to shoulder the cost of litigation. . . . When a private party is a real party in interest and actively participates in litigation along with the governmental agency, it is fair for that party to bear half the fees"]; see also *Save Agoura Cornell Knoll v. City of Agoura Hills* (2020) 46 Cal.App.5th 665, 711-713 [affirming fee award in CEQA action against defendant city to city *and* property owner who was proponent of development project]; *City of Los Angeles v. Metropolitan Water District of Southern California* (2019) 42 Cal.App.5th 290, 304-305 [affirming fee award jointly and severally against city department of water and power, which sued Metropolitan Water District to prevent its disclosure of customer records and *three water districts that intervened to oppose disclosure*].)[15]

---

[15] In their reply brief, Intervenors discuss our high court's 18-year-old decision in *Adoption of Joshua S.* (2008) 42 Cal.4th 945, which the same court later described as "carv[ing] out a limited exception" to section 1021.5 "where all three factors [governing eligibility for fees] are satisfied, but the party from whom fees are sought 'is not the type of party on whom private attorney general fees were intended to be imposed.' " (*Serrano v. Stefan Merli Plastering Co., Inc.* (2011) 52 Cal.4th 1018, 1026, 1027 (*Stefan II*).) Although the court expressed the caveat that it was *not* holding that "a party cannot be held liable for section 1021.5 attorney fees for engaging in litigation" (*Joshua S.,* at p. 957), *Joshua S.* left some question as to whether a defendant or real party in interest who defends a policy later determined to be contrary to the public interest merely by defending against a plaintiff's challenge can be liable for fees, but subsequent cases have indicated they may. (See *Stefan II,* at pp. 1021, 1027-1028 [court reporting company opposing plaintiffs' successful claim that its imposition of expediting fees on a party that did not order the deposition was unreasonable]; *Grossmont Union High School Dist. v. Diego Plus Education Corp.* (2023) 98 Cal.App.5th 552, 587 [by bringing postjudgment motions seeking to close charter school and enjoin charter school corporate entities from operating schools, school district and high school "were seeking to 'compromise[] public rights' " and fell outside *Joshua S.* exception]; *City of San Clemente v. Department of Transportation* (2023) 92 Cal.App.5th 1131, 1154-1155 [homeowners' association's lawsuit seeking to invalidate settlement agreement that achieved important public interest in protecting undeveloped land

## VII.

### *Intervenors' Remaining Arguments Lack Merit.*

Intervenors' remaining arguments—first, that Raptors was not a successful party as against them; second, that the trial court abused its discretion by not reducing the award because it was "unreasonable" and Raptors' success was "limited"; and, third, that by awarding the fees jointly and severally instead of apportioning them based on Intervenors' "limited participation" in the case—are equally unpersuasive.

Intervenors' contentions that Raptors was unsuccessful against Intervenors or had limited success fail for many reasons.  First, their contentions about lack of success are premised on an assertion that Raptors' "broader goal[]" was to "upend[]" the decision in a case called *Californians for Alternatives to Toxics v. Department of Pesticide Regulation, supra,* 136 Cal.App.4th 1049 (*CATS*), which held that the annual renewal of pesticides, which is subject to a 60-day time limit, does not require the Department to "make a hasty decision regarding possible reevaluation of a pesticide by tying reevaluation to the 60-day time frame of annual renewal." (*Id.* at p. 1066.)

In suggesting that overturning *CATS* was some broader goal Raptors pursued, Intervenors ignore the trial court's finding that "[Raptors] writ petition was brought to enforce certain provisions under CEQA and to protect the non-target wildlife that was being harmed by the ingestion of anti-coagulants contained in rodenticides such as Diphacinone. [¶] This action therefore resulted in the enforcement of an important right affecting the public interest and conferred a significant benefit on the general public because it resulted not only in [the

fell outside "narrow" *Joshua S.* exception; by suing to invalidate settlement, homeowners' association "took action to compromise the same public interests and rights the Environmental Parties had sought to protect"].)

Department's] reevaluation of anti-coagulant rodenticides, but also led in part to the passage of Assembly Bill 1322 [(2023-2024 Reg. Sess.)] that placed a moratorium on the use of Diphacinone pending completion of the reevaluation process." This finding is supported by the declaration of Raptors' founder and its counsel. Intervenors do not challenge these findings, which are therefore binding on this court. Since Intervenors raised the theory that Raptors had a "broader" goal and failed to achieve it, we must presume the court rejected it.

Further, We agree with the trial court's finding that Raptors achieved the result it sought—protection of non-target wildlife and reevaluation of the rodenticides that posed the greatest threat. "The 'successful party' under section 1021.5 is 'the party to litigation that achieves its objectives.' (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 571; *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1292 [a plaintiff is successful if it succeeds on any significant issue and achieves some benefit sought]; *RiverWatch v. County of San Diego Dept. of Environmental Health* (2009) 175 Cal.App.4th 768, 782-783, [party need not succeed on all of its claims].)" (*Friends of Spring Street, supra,* 33 Cal.App.5th at p. 1108.)

Relatedly, insofar as Intervenors' claim is that Raptors was unsuccessful against *them* because they intervened for the limited purpose of preserving the renewal process, again we disagree. As we have explained, Intervenors forfeited any challenge to the trial court's finding that "[t]heir participation went beyond merely arguing that re-evaluation is not required before annual renewal." And, as we have also said, we would reject any substantial evidence challenge to the finding even if we considered it on the merits.

Turning to Intervenors' claim that the court should have reduced the fees based on Raptors' so-called "limited success" or based on the fees being "unreasonable" is in tension with the trial court's findings and in any event is

28

governed by the abuse of discretion standard of review. (*Rey v. Madera Unified School Dist.* (2012) 203 Cal.App.4th 1223, 1239; *PCLM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1096.) It is also disingenuous.

Raptors' counsel submitted detailed records of the hours they spent and their hourly rates, which the trial court carefully reviewed. Raptors sought a lodestar of $832,660 and a multiplier of 1.5 for a total fee request of $1,248,990. The court found the hourly rates reasonable and generally found the number of hours "reasonable, considering the billing judgment exercised by [Raptors'] counsel, the complexity of the case, and the favorable comparison of the total hours incurred by Petitioner versus the combined hours incurred by Respondent and the Real Parties in Interest." However, the trial court reduced the lodestar by more than 20 percent, from $833,000 to $655,000, to eliminate the time Raptors unsuccessfully spent prior to filing the second amended petition. The court also carefully considered factors in favor of and factors against a multiplier and reduced the amount from 1.5 to 1.3 percent based on those factors. Comparison of the fees requested ($1,249,000) to the fees awarded ($852,000) shows the trial court reduced them by almost one third. Respondent's generalized arguments that the court should have reduced them omits that the trial court *did* reduce them and fail to show the court's analysis was an abuse of discretion.

Finally, Intervenors' similarly generalized argument that the court should have apportioned the fees between the Department, the other Real Parties in Interest and Intervenors again lacks both candor and any merit. Intervenors reiterate their false "limited participation" to address "narrow issues" argument, which we have already rejected. They fail to mention the fee negotiations other than to claim they did not participate in "settlement discussions between [Raptors] and the Department." The facts, in a nutshell, are that Raptors attempted to settle the attorney fee and cost issue with the Department, which "took the position that

Real Parties and Intervenors should contribute to the fee settlement." Raptors then conveyed the offer it had made to the Department to Real Parties and Intervenors in December 2023 in the hope of reaching a global settlement of fees but received no response. Raptors then conveyed a reduced offer to all the parties, and Intervenors again failed to respond and later made clear they were unwilling to contribute to any fee settlement. After its continued efforts to engage with Intervenors were met with silence and it was informed that Real Parties planned to make their own motion to recover fees, Raptors filed its motion and set it for hearing. In response to Raptors' motion the Department argued Real Parties and Intervenors should be responsible for 30 percent of any award, while Intervenors and Real Parties disclaimed any responsibility for fees. Concerned with "the prospect of chasing after numerous parties across the nation for bits and pieces of its fee recovery," Raptors argued that "apportionment would be unduly burdensome." Recognizing that all opposing parties disagreed with each other about any apportionment, the trial court declined to impose an allocation that would require Raptors to engage in extensive collection activities and ordered that all opposing parties were jointly and severally liable to Raptors for the fee award.

Intervenors fail to show this was an abuse of discretion. We agree with the Third District's observation in *Friends of the Trails v. Blasius* (2000) 78 Cal.App.4th 810 (*Blasius*): "[T]here are two aspects of such an 'apportionment.' One is liability between the different opposing parties and the successful party. The other is responsibility for contribution or indemnity between opposing parties. As to the first aspect, we disavow the notion that, as a general matter, opposing parties are entitled to an apportionment of their liability under Code of Civil Procedure section 1021.5 as to the successful party. [¶] An award of attorney's fees under Code of Civil Procedure section 1021.5 is an obligation. When an obligation is imposed on several persons it is presumed to be joint. (§ 1431.) Treating the

30

Code of Civil Procedure section 1021.5 obligation of more than one opposing parties as joint is consistent with the purposes of that statute. If the obligation is apportioned in the sense that it is not joint the successful party faces greater difficulty in collection of the judgment for attorney's fees and some of the attorney's fees will not be recoverable if any opposing party is insolvent. [¶] That leaves apportionment as between the opposing parties. [The defendant] cites no case law in which it has been held that the trial court has abused its discretion in failing to make an apportion upon request. (See *Corder v. Gates* (9th Cir. 1991) 947 F.2d 374, 383 [under federal law refusal to make an apportionment no abuse of discretion].) As a general rule, the cause of action, if any, for contribution between parties to a joint obligation arises when one has satisfied more than its share. (See § 1432; Code Civ. Proc., §§ 882, 883.)" (*Id.* at pp. 837-838, fn. omitted.)

Raptors cited *Blasius* in its respondent's brief. Intervenors' response to the case in their reply is to ignore it. Like the defendant in *Blasius*, Intervenors cite no case holding that failure to apportion was an abuse of discretion, and *Blasius* is persuasive authority to the contrary.

## DISPOSITION

For the reasons we have set forth, we affirm the trial court's decision awarding attorney fees jointly and severally against all opposing parties, including Intervenors. Raptors shall recover its costs.

STEWART, P.J.


We concur.


RICHMAN, J.


DESAUTELS, J.


*Raptors Are the Solution v. CropLife America, et al.* (A171537)

Trial Court:  Alameda County Superior Court

Trial Judge:        Hon. Brad Seligman

Counsel:

Venable, Tyler G. Welti and Michael T. Gluk; Kahn Soares & Conway, Ann Grottveit for Intervenors and Appellants.

Environmental Law Clinic, Mills Legal Clinic at Stanford Law School, Deborah A. Sivas and Amanda D. Zerbe; Michael W. Graf for Plaintiff and Respondent.

Natural Resources Defense Council, Jared E. Knicley and Michael E. Wall as Amicus Curiae.